# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

**CAMERON ANGEL BROWN, ESQ.**,

              Plaintiff,

vs.

**ALPHASENSE, INC.**,

          Defendant.

**Case No.:**
**COMPLAINT**

**JURY TRIAL DEMANDED**

## PRELIMINARY STATEMENT

This action arises from Defendant AlphaSense, Inc.'s unlawful, retaliatory, and ethically indefensible pretextual rejection and ultimate withdrawal of a senior in-house legal offer to Plaintiff Cameron A. Brown, Esq., following AlphaSense's sole reliance on confidential employment information that it had neither a legal right to obtain nor an ethical right to act upon. That information—that Plaintiff was purportedly "on administrative leave" from his prior firm Paul Hastings LLP—was not only contractually protected under the terms of a binding (now contested) "Confidential" Transition Agreement with Paul Hastings, but was also inherently non-adverse and subject to multiple benign interpretations. It did not constitute misconduct, discipline, or any formal action that would justify disqualification from employment consideration, particularly for a candidate of Plaintiff's standing.

Plaintiff is a licensed New York attorney and a former associate of two nationally recognized law firms (see **Exhibit A**, Plaintiff's application materials). At the time of AlphaSense's ultimate withdrawal, he had already filed a formal arbitration demand against Paul Hastings LLP, asserting that the firm's actions—including the unlawful disclosure of his internal employment status—constituted retaliation, breach of contract, and reputational sabotage. Plaintiff

COMPLAINT JURY TRIAL DEMANDED - 1

was also bound by a (now contested) "confidentiality" agreement that precluded him from publicly discussing the matter—even in his defense to an alleged intention leak of information by Paul Hastings. AlphaSense, through its Vice President of Legal, Mr. Herbert Wang, not only failed to act lawfully, but instead placed the burden on Plaintiff to violate his own legal obligations in order to remain eligible for consideration.

When asked by Wang whether he would "like to explain" the meaning or circumstances of being on "administrative leave," Plaintiff—at the time bound by his professional ethics and contractual confidentiality—declined to speculate or breach his duties. Instead, he reaffirmed his continued employment status and offered to facilitate direct verification through the firm's General Counsel Adele Maloney and its Global Chair of Litigation Kwame Manley. Mr. Wang verified Plaintiff's continued employment. Because the firm would not release detailed information about Plaintiff's confidential employment status, Mr. Wang rejected Mr. Brown—AlphaSense's admitted number one candidate.

By relying exclusively on unverified reputational whisper—clearly originating from a confidential source with institutional motive—AlphaSense not only undermined Plaintiff's legal rights, but also amplified the very retaliatory harm that Plaintiff had alleged against Paul Hastings. AlphaSense's conduct converted an internal legal matter into an external act of discrimination, compounding the reputational damage inflicted by third parties and chilling Plaintiff's ability to pursue justice within the legal profession.

This lawsuit seeks compensatory, statutory, and declaratory relief under the New York State Human Rights Law (N.Y. Exec. Law § 296), the New York City Human Rights Law (NYC Admin. Code § 8-107), and applicable common law doctrines. It demands

COMPLAINT JURY TRIAL DEMANDED - 2

accountability for the unlawful rescission of a legitimate employment offer based on improper reliance on confidential, misunderstood, and unverified information—and it affirms that candidates, particularly those under legal duress or speaking out against retaliation, are entitled to fairness, not silence and erasure.

**PARTIES**

**Plaintiff Cameron A. Brown, Esq.** is an individual residing in Washington, D.C., and a licensed attorney in good standing with the New York State Bar (and the District of Columbia Bar). Plaintiff has previously served as an associate at nationally recognized law firms and maintains active professional and reputational ties to the New York legal market. Plaintiff is the named claimant in a pending arbitration proceeding against Paul Hastings LLP (JAMS Ref. No. 54100011134) (see **Exhibit B**), and is the plaintiff in a related legal malpractice action against his former counsel, Frederick D. Cooke, Jr., currently pending in the Superior Court of the District of Columbia (Case No. 2025-CAB-003923) (see **Exhibit C**). All acts undertaken by Plaintiff in connection with this matter are in his personal capacity and not as counsel of record as a barred New York attorney.

**Defendant AlphaSense, Inc.** is a Delaware corporation with its principal place of business in New York County, New York. AlphaSense is a late-stage, venture-backed market intelligence and technology platform operating on a "remote-first" model. Upon information and belief, at all relevant times, AlphaSense maintained legal, human resources, and executive operations in New York and conducted material portions of its hiring, decision-making, and employment negotiations with Plaintiff remotely. Defendant's conduct, including the communications and employment decisions giving rise to this action, occurred primarily through its New York-based office and headquarters.

COMPLAINT JURY TRIAL DEMANDED - 3

## JURISDICTION AND VENUE

This Court has personal jurisdiction over Defendant pursuant to CPLR §§ 301 and 302. Defendant AlphaSense, Inc. is authorized to do business in the State of New York and maintains its principal place of business in New York County. Defendant conducted substantial and continuous business activity in this state and committed the acts and omissions giving rise to this action within the State of New York and New York County specifically.

Venue is proper in this Court pursuant to CPLR § 503 because Defendant maintains its headquarters, executive offices, and principal place of business in New York County. All material events underlying Plaintiff's claims—including communications, employment decisions, and the withdrawal of the employment offer—occurred within or were directed by way of Defendant's principal office located in New York County.

## FACTUAL ALLEGATIONS

### A. Recruitment and Initial Communications

In March and April 2025, Plaintiff Cameron A. Brown, Esq., was actively engaged in a final-round interview process for the position of Senior Counsel, Litigation & Commercial at AlphaSense, Inc. The role was designated as a first-in-its-kind litigation, remote-first, senior role. After progressing through multiple rounds of interviews and receiving consistently positive feedback, Plaintiff was informed on April 25, 2025, that AlphaSense would not be moving forward with his candidacy (see **Exhibit D)**. Mr. Herbert Wang, Vice President of Legal, was copied on the email and offered to provide additional context if requested.

COMPLAINT JURY TRIAL DEMANDED - 4

Plaintiff immediately responded and asked for further clarification. Shortly thereafter, Plaintiff and Mr. Wang spoke by phone. During that conversation, Mr. Wang stated that AlphaSense had heard from "a reliable source" that Plaintiff was "on administrative leave" from Paul Hastings. Mr. Wang then asked, "Would you like to explain?" Plaintiff reaffirmed that he remained employed at Paul Hastings. Plaintiff reiterated that Mr. Wang could contact the firm's General Counsel Adele Maloney or Global Chair of Litigation Kwame Manley to obtain lawful verification, consistent with Plaintiff's ongoing confidentiality obligations.

In doing so, he provided Mr. Wang with the direct contact information for Ms. Maloney and Mr. Manley. Plaintiff explicitly authorized and invited AlphaSense to contact either official to confirm his continued employment and to address any lingering ambiguity regarding his candidacy or professional standing—which initially caught Mr. Wang off-guard.

This outreach was made in good faith, in reliance on standard hiring protocols, and with full awareness of Plaintiff's legal and ethical limitations regarding the disclosure of confidential employment information. Moreover, Plaintiff put Paul Hastings on notice of the leak of his confidential employment information and requested that when Mr. Wang reach out that they dispel all "adverse inferences [sic]." (see **Exhibit E**).

### B. Wang's Explanation and Retraction of Offer

On April 30, 2025, Mr. Wang responded in writing to confirm that he had contacted the Paul Hastings officials Plaintiff had identified (see **Exhibit D)**. He acknowledged receipt of verification that Plaintiff remained employed, but stated:

> "Unfortunately, they only confirmed that you're still employed with the firm—not any specific standing. Unless you are able to convince them to speak with me more openly about this, we will have to move on to other candidates who have been waiting on us to give them a decision."

COMPLAINT JURY TRIAL DEMANDED - 5

As a New York-barred attorney and officer of the court, Plaintiff was ethically and contractually prohibited from disclosing the nature or context of his internal employment status. Such information was explicitly protected under a signed and now contested "confidentiality" agreement with Paul Hastings (see attachment to **Exhibit B, Ex. A "Transition Agreement")**. Plaintiff responded truthfully and appropriately: confirming that he remained employed, affirming that he was not under investigation or discipline, and noting that any ambiguity likely resulted from the firm's policy of not engaging in informal or formal disclosure of employees' confidential employment status. Plaintiff reiterated that he would willing supply AlphaSense with additional official references, if helpful.

Nonetheless, on May 1, 2025, Mr. Wang emailed Plaintiff a final message, confirming that AlphaSense would be moving forward with other candidates. While the email expressed regret, it reaffirmed that the decision was final (see **Exhibit D**).

### C. Confidentiality Breach and Lack of Legal Justification

At no point did AlphaSense offer a lawful or independently verifiable basis for rescinding Plaintiff's candidacy other than the assertion—received through an undisclosed, "reliable," third party—that Plaintiff was on "administrative leave." This employment status, to the extent it existed at all, was explicitly governed by a confidentiality provision contained in a now contested "Confidential" Transition Agreement executed between Plaintiff and Paul Hastings LLP. Plaintiff's ability to speak about or clarify the nature of that status was strictly limited by both contract and the ethical obligations imposed upon him as a New York-barred attorney.

Mr. Wang, a licensed attorney himself, either knew or should have known that the term "administrative leave" is not synonymous with disciplinary action or misconduct. It

COMPLAINT JURY TRIAL DEMANDED - 6

can arise from benign or non-adverse circumstances, including protected activity, internal investigations not resulting in findings, or negotiated transitions. Relying on that designation was inherently both improper, unlawful and discriminatory.

Moreover, Mr. Wang's written statement that Plaintiff must "convince" his former employer to "speak more openly" in order to remain in consideration imposed an unethical and coercive condition. Plaintiff was being asked to waive or breach his confidentiality obligations to remain eligible for a role for which he had already been informally selected as the final candidate. When Plaintiff declined to violate those legal obligations, AlphaSense terminated his candidacy.

The status of being on "administrative leave," particularly when governed by a confidentiality agreement, is not a lawful basis for disqualification. Under NYC Human Rights Law, adverse employment action based on employment status—whether formal or perceived—is impermissible when rooted in protected categories, legal activity, or silence compelled by contractual or ethical duties.

By relying solely on misunderstood, confidential (by contract and public policy), and reputationally charged information—and by conditioning continued consideration on the waiver of Plaintiff's rights—AlphaSense rendered itself a direct participant in the retaliatory dynamics that Plaintiff was actively seeking to escape. The company failed to acknowledge the legal significance of the confidentiality framework it was exploiting.

### D. Notice of Legal Claims and AlphaSense's Non-Response

On June 21, 2025, Plaintiff served Mr. Herbert Wang with a formal Notice of Potential Legal Claims and Request for Preservation of Records. The letter expressly stated:

> "AlphaSense's decision was based on information—or lack thereof—conveyed by my former employer, Paul Hastings LLP. I expressly clarified my employment status and rebutted any adverse inference before the decision was finalized."

COMPLAINT JURY TRIAL DEMANDED - 7

The notice further requested that AlphaSense preserve all records—including emails, internal notes, Slack communications, text messages, and meeting documentation—relating to Plaintiff's candidacy, the hiring decision, and any discussions referencing Plaintiff or Paul Hastings LLP.

No substantive response was received. Mr. Wang did not acknowledge the notice, initiate any follow-up, or offer clarification. The only reply was an automated out-of-office message, indicating that Mr. Wang would be unavailable until July 1, 2025. No other AlphaSense representative responded on his behalf. As of the date of this filing, Defendant has made no effort to correct the record, remedy the harm, or engage in any resolution effort despite having received formal legal notice and having filled the Senior Counsel, Litigation & Commercial role as of June 1, 2025.

### E. Context of Parallel Legal Filings

At the time AlphaSense formally withdrew its consideration of Plaintiff, Plaintiff had already initiated legal proceedings concerning the very information that was improperly used to justify that decision. Specifically, on April 28, 2025, Plaintiff filed a detailed arbitration demand against Paul Hastings LLP, alleging unlawful retaliation, coercion, and breach of the confidentiality agreement executed in connection with his separation from the firm (**see Exhibit B**). That demand expressly identified the "administrative leave" designation as confidential, reputationally harmful, and unlawfully disclosed.

Subsequently, on June 18, 2025, Plaintiff filed a legal malpractice action in the Superior Court of the District of Columbia (Case No. 2025-CAB-003923) against Frederick D. Cooke Jr., the attorney who had advised him during the negotiation and

COMPLAINT JURY TRIAL DEMANDED - 8

execution of the Transition Agreement that Paul Hastings later used to frame and conceal the retaliatory nature of Plaintiff's departure (see **Exhibit C**).

By June 2025, AlphaSense—through its legal department and direct receipt of Plaintiff's formal notice—had both constructive and actual notice of Plaintiff's claims. Nonetheless, AlphaSense made no effort to mitigate its exposure as a secondary participant in the retaliatory sequence now the subject of public and arbitral litigation.

### F. Resulting Economic and Reputational Harm

The AlphaSense opportunity represented a transformative career pivot for Plaintiff, with compensation valued in excess of $200,000, including base salary, performance bonus, and pre-IPO equity. The position offered not only financial stability but a strategic professional trajectory—one that Plaintiff had earned through competitive screening and demonstrated qualifications.

The loss of this role, particularly under conditions where Plaintiff was legally and ethically barred from defending himself, inflicted substantial and measurable harm. Plaintiff experienced immediate economic loss, reputational impairment within the legal and tech communities, and further entrenchment of the retaliatory narrative initiated by his former employer Paul Hastings. AlphaSense's decision ensured that Plaintiff's departure from Paul Hastings would not remain a private legal matter, but rather would become a publicly damaging and professionally disqualifying event—based entirely on confidential and misunderstood information.

Had AlphaSense exercised basic respect for Plaintiff's and Paul Hastings ethical and confidential obligations, the harm could have been avoided. Plaintiff extended every opportunity for lawful clarification and compliance. Instead, AlphaSense disregarded Plaintiff's professional boundaries, bypassed verification, and relied exclusively on reputational innuendo. By doing so,

COMPLAINT JURY TRIAL DEMANDED - 9

it became a secondary instrument of the very retaliation Plaintiff had already alleged through formal legal process.

AlphaSense's actions were not merely procedurally deficient or unfair. They were discriminatory, retaliatory, and unlawful under New York law.

## CAUSES OF ACTION

### 1. Violation of NYSHRL – Retaliation and Discriminatory Treatment

### (N.Y. Exec. Law § 296)

Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

Plaintiff engaged in protected activity within the meaning of the New York State Human Rights Law ("NYSHRL"), including but not limited to: initiating legal proceedings against his former employer for retaliation, coercion, and breach of confidentiality; refusing to violate contractual and ethical obligations by disclosing confidential, internal employment status; and asserting his right to pursue employment free from discrimination based on confidential or reputationally charged adverse inferences.

Defendant AlphaSense, Inc. relied exclusively on information arising from this protected activity—namely, Plaintiff's confidential "administrative leave" designation, which was itself the subject of a (now contested) "confidential" agreement, against New York state law and public policy—as the basis for rescinding Plaintiff's candidacy for a senior legal role. Furthermore, AlphaSense required Plaintiff to "convince" his former employer to disclose confidential information, then disqualified him when he lawfully declined to do so.

COMPLAINT JURY TRIAL DEMANDED - 10

By relying on protected conduct and confidential status in making its hiring decision, Defendant violated N.Y. Exec. Law § 296(1)(a) and § 296(7), which prohibit both direct discrimination and retaliation against individuals who engage in protected legal or professional activity. As a result, Plaintiff suffered economic loss, reputational damage, and further retaliation for his protected pursuit of legal redress. Plaintiff is entitled to compensatory damages, punitive damages, declaratory relief, and all other remedies available under the NYSHRL.

### 2. Violation of NYCHRL – Retaliation and Disparate Treatment

### (NYC Admin. Code § 8-107)

Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

First, Plaintiff's confidential employment status—whether described as "on leave," "transitioning," or otherwise—falls within the scope of protected conditions under NYC Admin. Code § 8-107(1)(a), which prohibits adverse treatment based on perceived employment status or uncertainty arising from non-disclosures tied to protected activity.

Defendant AlphaSense, Inc., headquartered in New York County and subject to the jurisdiction of the New York City Human Rights Law ("NYCHRL"), engaged in unlawful discrimination and retaliation against Plaintiff based on his engagement in protected legal activity and the improper use of confidential employment information as a basis for withdrawal of an employment opportunity.

The NYCHRL imposes a broader standard of liability than its state counterpart, prohibiting any employment decision motivated "in part" by protected status, legal activity, or perceived reputational risk. At the time of AlphaSense's withdrawal of Plaintiff's candidacy, Plaintiff had

COMPLAINT JURY TRIAL DEMANDED - 11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

engaged in protected legal processes, including filing an arbitration demand against his former employer and declining to violate a confidentiality agreement in response to improper pressure.

Defendant's reliance on Plaintiff's confidential "administrative leave" status—an inherently ambiguous and confidential designation tied to the very claims Plaintiff had initiated—was the sole factor in the decision to rescind his candidacy. Plaintiff was told explicitly that AlphaSense could not proceed unless he convinced his former employer to disclose more information about that status. When Plaintiff declined to do so, the offer was revoked.

This conduct constitutes retaliation and disparate treatment under NYC Admin. Code § 8-107(1)(a) and § 8-107(7). Defendant's actions denied Plaintiff an employment opportunity on the basis of perceived controversy, legal vulnerability, and protected professional activity. As a direct result, Plaintiff suffered economic and reputational harm and is entitled to compensatory damages, punitive damages, attorneys' fees, and all other relief available under the NYCHRL.

### 3. Tortious Interference with Prospective Economic Advantage

Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

Plaintiff had a clear and well-advanced economic opportunity with Defendant AlphaSense, Inc., having completed multiple rounds of interviews and received consistent indications that an offer was forthcoming. Plaintiff's candidacy progressed to final-stage consideration for the role of Senior Counsel, Litigation & Commercial, with a projected first-year compensation package exceeding $200,000.

COMPLAINT JURY TRIAL DEMANDED - 12

Defendant was aware that the details of Plaintiff's employment record—beyond the fact of employment—was inherently confidential. There exists varied, innocuous justifications for "administrative" leave that are protected from disclosure. Whether administrative leave, parental leave, medical leave under the FMLA, disability-related leave, or other protected employment grievances or accommodations—they are explicitly protected under federal, state, and city law, and cannot lawfully serve as the basis for rejecting or withdrawing a candidate's employment opportunity, particularly when the employer neither verifies the information nor permits the candidate to lawfully respond.

This conduct constituted an intentional and unjustified interference with Plaintiff's prospective employment and economic opportunity. Defendant's actions were not privileged, were carried out with full knowledge of the constraints imposed on Plaintiff, and resulted in the unlawful rescission of a high-value employment opportunity. As a direct and foreseeable consequence, Plaintiff suffered substantial financial loss, reputational injury, and the continuation of a pattern of retaliatory harm originating from his prior employer. Plaintiff is entitled to compensatory and punitive damages in an amount to be determined at trial.

### 4. Negligent Hiring Conduct / Breach of Ethical Obligation

### (Common Law)

Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

Defendant AlphaSense, Inc., acting through its Vice President of Legal, Mr. Herbert Wang, owed Plaintiff a duty of care consistent with the standards expected of legal professionals involved in evaluating candidates for in-house legal roles. Mr. Wang is a licensed attorney and was responsible for leading and executing the decision to withdraw Plaintiff's candidacy.

COMPLAINT JURY TRIAL DEMANDED - 13

Instead of considering only objective criteria, Mr. Wang acted on confidential, vague, unverified, and reputationally charged third-party information—specifically, the claim that Plaintiff was on "administrative leave." He did so without confirming the meaning or accuracy of that term through lawful means. Moreover, Mr. Wang placed the burden on Plaintiff to induce his former employer Paul Hastings to make privileged and confidential disclosures. Rather than respecting Plaintiff's ethical disclosures about his employment status, Wang treated Paul Hastings' alleged intentional, retaliatory silence be the sole ground for disqualification.

This conduct constituted a breach of the standard of care owed by an attorney engaged in a sensitive legal hiring process. Wang failed to act with the diligence, neutrality, and ethical restraint required of his role, and instead engaged in reputational gatekeeping based on unverifiable innuendo. As a direct result of this breach, Plaintiff was denied a career opportunity for which he was fully qualified, suffered economic loss, reputational damage, and further entrenchment of retaliatory stigma. Plaintiff seeks compensatory damages and all other relief deemed just and proper under New York common law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendant AlphaSense, Inc., and award the following relief:

1. Compensatory damages in an amount to be determined at trial, currently estimated between $250,000 and $500,000;

2. Statutory and punitive damages as authorized under the New York State Human Rights Law and New York City Human Rights Law;

COMPLAINT JURY TRIAL DEMANDED - 14

3.      Injunctive relief, including correction of internal records and, if warranted, formal notice to Plaintiff's professional references or any third parties who received or relied upon adverse employment information;

4.      Declaratory relief affirming that Defendant's conduct constitutes unlawful retaliation and discriminatory hiring under applicable New York law;

5.      Reasonable attorneys' fees and costs, if Plaintiff retains counsel and becomes eligible for such relief under statute;

6.      Pre- and post-judgment interest as provided by law;

7.      Such other and further relief as the Court may deem just and proper.

**I affirm under penalty of perjury that the foregoing is true to the best of my knowledge, information, and belief.**

**Dated: June 30, 2025**

Respectfully submitted,

Cameron A. Brown, Esq.
(NY Bar No. 5575113)
1625 Eckington PL NE PH104
Washington, D.C. 20002
Tel:     (909) 833-5169
Email: cabrwn@gmail.com

*Pro Se Plaintiff*

COMPLAINT JURY TRIAL DEMANDED - 15

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

**CAMERON ANGEL BROWN, ESQ.,**

              Plaintiff,

vs.

**ALPHASENSE, INC.,**

              Defendant.

**Index No:**

**Date Index No. Purchased:**

**SUMMONS**

To the above named Defendant(s):

**AlphaSense, Inc., 24 Union Square East, 5th Floor, New York, NY 10003**

You are hereby summoned to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

The basis of this venue is **Defendant's principal place of business is located in New York County**, which is **24 Union Square East, 5th Floor, New York, NY 10003**

**Dated: June 30, 2025**

Respectfully,

_____

Cameron A. Brown, Esq.
(NY Bar No. 5575113)
1625 Eckington PL NE PH104
Washington, D.C. 20002
Tel:    (909) 833-5169
Email: cabrwn@gmail.com

*Pro Se Plaintiff*

EXHIBIT A

**Cameron A. Brown**
1625 Eckington PL NE, PH104, Washington, D.C. 20002 – 909.833.5169 – cabrwn@gmail.com

**Strategic Legal Counsel | Litigation & Internal Investigations | Regulatory Compliance | Risk Management**

Results-driven attorney with 7+ years' experience advising Fortune 500 clients, government entities, nonprofits and senior executives on risk mitigation, regulatory compliance, complex litigation and internal investigations. Proven ability to translate legal complexity into actionable business advice and legal advocacy. Skilled in managing cross-functional teams, overseeing high-stakes litigation and internal investigations, and aligning legal strategy with business goals. Trusted advisor with deep experience in the technology, consumer products, healthcare and financial services sectors.

## EDUCATION

**Stanford Law School**                                                                                 Stanford, CA
Juris Doctor                                                                                              June 18, 2017
**Honors:** Judge Thelton E. Henderson Prize for Outstanding Clinical Coursework; Pro Bono Distinction (High)
**Activities:** Senior Editor, *Stanford Journal of Civil Rights and Civil Liberties*; Criminal Defense Clinic

**University of California, Davis**                                                                       Davis, CA
B.A. in Economics, *Cum Laude*, Departmental Honors, and Phi Beta Kappa                                   June 16, 2012
GPA: 3.913/4.0

## EXPERIENCE

**Paul Hastings LLP**                                                                                     Washington, D.C.
*Senior Litigation Associate*                                                                            Sept. 2024 – Present
- Advised corporate clients on litigation strategy with a focus on aligning legal risk mitigation with overarching business objectives.
- Directed pre-litigation assessments and case strategy sessions with senior executives and internal stakeholders, delivering actionable legal recommendations to inform settlement, risk exposure, and litigation posture.
- Oversaw legal teams in drafting complex pleadings and discovery materials, ensuring accuracy, consistency, and alignment with business risk profiles; provided mentorship that improved team efficiency and deliverable quality.
- Drafted dispositive and sanctions motions that curtailed litigation exposure, positioned the client for early resolution, and preserved leverage in settlement negotiations.
- Provided strategic counsel in pro bono initiative affecting 40,000 veterans' benefits claims, coordinating with DOJ and VA stakeholders to streamline readjudication processes and improve agency compliance.

**U.S. Department of Justice, Civil Division, Consumer Protection Branch**                                Washington, D.C.
*Trial Attorney*                                                                                         Oct. 2023 – Sept. 2024
- Led cross-border fraud investigations involving Fortune 500 entities, coordinating with international regulators and law enforcement to develop evidence, enforce compliance, and mitigate reputational risk.
- Provided legal analysis on regulatory frameworks governing consumer safety and international trade, shaping investigative strategies that aligned with U.S. enforcement priorities.
- Led grand jury investigations and witness interviews in high-profile enforcement actions, identifying critical evidence that led to actionable regulatory outcomes and enforcement decisions.

**Williams & Connolly LLP**                                                                               Washington, D.C.
*Litigation Associate*                                                                                   Nov. 2019 – April 2023
- Served as key trial team member in legal malpractice defense with multimillion-dollar exposure, supporting trial strategy, evidentiary arguments, and real-time courtroom decisions.
- Led fact and expert witness depositions in complex civil litigation, shaping case narratives and influencing settlement leverage; prepared comprehensive deposition strategies tied to client risk profiles.
- Prepared and argued discovery and evidentiary motions, securing favorable rulings that narrowed issues and reduced litigation burden for clients.

- Directed large-scale e-discovery and document production, leveraging technology solutions to ensure cost-effective compliance and mitigate legal exposure during discovery negotiations.

**United States District Court for the Eastern District of Michigan**                                    Flint & Detroit, MI
*Federal Judicial Law Clerk to the Hon. Linda V. Parker*                                              Aug. 2018 – Aug. 2019
- Oversaw civil and criminal dockets, expediting case resolution through efficient motion review and proactive case management recommendations to chambers.
- Authored judicial decisions on complex procedural and substantive motions, applying federal standards with precision to support consistent and defensible rulings.
- Provided critical legal support during hearings and trials, ensuring procedural integrity and advising on evidentiary and procedural issues in real time.

**Paul, Weiss, Rifkind, Wharton & Garrison LLP**                                              Washington, D.C.
*Litigation Associate*                                                                     Sept. 2017– July 2018
- Delivered actionable legal research and analysis on procedural and regulatory issues, informing litigation strategy and compliance for corporate clients in high-risk sectors.
- Supported regulatory investigations involving the SEC and DOJ, preparing witnesses and developing legal strategy to navigate enforcement risks and compliance obligations.
- Led discovery management for large-scale matters, achieving favorable resolutions in discovery disputes while ensuring compliance with legal hold and production requirements.

## ADDITIONAL INFORMATION

**Bar Admissions**:                                              **Court Admissions**:
New York - (5575113)                                              D.C. Circuit Court of Appeals
District of Columbia - (229532)                                   Sixth Circuit Court of Appeals
                                                                  Eastern District of Michigan

# STANFORD UNIVERSITY

## OFFICE OF THE UNIVERSITY REGISTRAR

### STANFORD, CA 94305-6032

Name: Brown,Cameron A
Student ID: 05916962

RECEIVED NYSCEF: 06/30/2025

*Johanna Metzgar*
Johanna Metzgar
Registrar

In accordance with USC 438 (6) (4) (8) (The Family Educational Rights and Privacy Act of 1974), you are hereby notified that this information is provided upon the condition that you, your agents or employees will not permit any other party access to this record without consent of the student. Alteration of this transcript may be a criminal offense.

Print Date: 06/14/2019

-------- Stanford Degrees Awarded ---------

| | |
|---|---|
| Degree | : Doctor of Jurisprudence |
| Confer Date | : 06/18/2017 |
| Plan | : Law |

-------- Academic Program ---------

| | |
|---|---|
| Program | : Law JD |
| 09/22/2014 | : Law (JD) |
| | Completed Program |

-------- Beginning of Academic Record ---------

### 2014-2015 Autumn

| Course | | Title | Attempted | Earned | Grade |
|---|---|---|---|---|---|
| LAW | 201 | CIVIL PROCEDURE I | 4.00 | 4.00 | P |
| | | Shirin Sinnar | | | |
| LAW | 205 | CONTRACTS | 4.00 | 4.00 | H |
| | | Tess Wilkinson-Ryan | | | |
| LAW | 207 | CRIMINAL LAW | 4.00 | 4.00 | P |
| | | David Sklansky | | | |
| LAW | 219 | LEGAL RESEARCH AND WRITING | 2.00 | 2.00 | P |
| | | Cortelyou Kenney | | | |
| LAW | 223 | TORTS | 4.00 | 4.00 | P |
| | | Robert Rabin | | | |

### 2014-2015 Winter

| Course | | Title | Attempted | Earned | Grade |
|---|---|---|---|---|---|
| LAW | 203 | CONSTITUTIONAL LAW | 3.00 | 3.00 | P |
| | | Bernadette Meyler | | | |
| LAW | 217 | PROPERTY | 4.00 | 4.00 | P |
| | | Mark Kelman | | | |
| LAW | 224 | FEDERAL LITIGATION: COURSEWORK | 2.00 | 2.00 | P |
| | | Thea Johnson | | | |
| LAW | 242 | CORPORATIONS | 4.00 | 4.00 | P |
| | | Ryan Bubb | | | |

### 2014-2015 Spring

| Course | | Title | Attempted | Earned | Grade |
|---|---|---|---|---|---|
| LAW | 224B | FEDERAL LITIGATION: METHODS | 1.00 | 1.00 | H |
| | | Thea Johnson | | | |
| LAW | 224C | FEDERAL LITIGATION: PRACTICE | 1.00 | 1.00 | P |
| | | Thea Johnson | | | |
| LAW | 339 | EMPLOYMENT LAW | 3.00 | 3.00 | P |
| | | Alison Morantz | | | |
| LAW | 772 | CAREER DEVELOPMENT: ALCHEMY, LAW, AND PRACTICE | 2.00 | 2.00 | H |
| | | Jeff Strnad | | | |
| LAW | 793 | CONSTITUTIONAL LITIGATION AND PUBLIC POLICY: RACE AND CRIMINAL JUSTICE | 2.00 | 2.00 | H |
| | | Michael Risher | | | |
| LAW | 794 | INTRODUCTION TO FINANCE | 2.00 | 2.00 | MP |
| | | Robert Daines | | | |

### 2015-2016 Autumn

| Course | | Title | Attempted | Earned | Grade |
|---|---|---|---|---|---|
| LAW | 312 | CRIMINAL PROCEDURE: INVESTIGATION | 4.00 | 4.00 | P |
| | | Robert Weisberg | | | |
| LAW | 527 | JUVENILE CRIME, JUVENILE JUSTICE | 3.00 | 3.00 | P |
| | | Joan Petersilia | | | |
| LAW | 610 | TRIAL ADVOCACY WORKSHOP | 5.00 | 5.00 | MP |
| | | Jeffrey Kobrick; Sallie Kim; Timothy Hallahan | | | |

### 2015-2016 Winter

| Course | | Title | Attempted | Earned | Grade |
|---|---|---|---|---|---|
| LAW | 290 | EVIDENCE | 5.00 | 5.00 | H |
| | | George Fisher | | | |
| LAW | 297 | ENTERTAINMENT LAW | 3.00 | 3.00 | P |
| | | Bertram Fields; Bonnie Eskenazi | | | |
| LAW | 562 | COMPARATIVE CIVIL RIGHTS | 4.00 | 4.00 | H |
| | | Richard Ford | | | |
| LAW | 562A | COMPARATIVE CIVIL RIGHTS: PARIS FIELD STUDY | 1.00 | 1.00 | MP |
| | | Richard Ford | | | |
| LAW | 784 | CRITICAL RACE THEORY | 1.00 | 1.00 | MP |
| | | Kenneth Mack | | | |

Page 1 of 2

Key to Transcript

Send To:   Cameron Brown

This document has been digitally signed and therefore contains special characteristics. A document that contains a digital signature can be instantly validated. See final page of this PDF for further explanation.

- COPY OF CERTIFIED PDF -

FILED: NEW YORK COUNTY CLERK 06/30/2025 04:50 PM INDEX NO. 158324/2025
NYSCEF DOC. NO. 2 RECEIVED NYSCEF: 06/30/2025

UNOFFICIAL TRANSCRIPT IN PDF FORMAT ONLY

# STANFORD UNIVERSITY

## OFFICE OF THE UNIVERSITY REGISTRAR

### STANFORD, CA 94305-6032

Name: Brown, Cameron A
Student ID: 05916962

*Johanna Metzger*
Johanna Metzger
Registrar

In accordance with USC 438 (6) (4) (8) (The Family Educational Rights and Privacy Act of 1974), you are hereby notified that this information is provided upon the condition that you, your agents or employees will not permit any other party access to this record without consent of the student. Alteration of this transcript may be a criminal offense.

**2015-2016 Spring**

| Course | | Title | Attempted | Earned | Grade |
|---|---|---|---|---|---|
| LAW | 408A | CRIMINAL DEFENSE CLINIC: CLINICAL PRACTICE | 4.00 | 4.00 | H |
| Transcript Note: | | Judge Thelton E. Henderson Prize for Outstanding Performance | | | |
| | | Ronald Tyler; Suzanne Luban | | | |
| LAW | 408B | CRIMINAL DEFENSE CLINIC: CLINICAL METHODS | 4.00 | 4.00 | P |
| | | Ronald Tyler; Suzanne Luban | | | |
| LAW | 408C | CRIMINAL DEFENSE CLINIC: CLINICAL COURSEWORK | 4.00 | 4.00 | H |
| | | Ronald Tyler; Suzanne Luban | | | |

**2016-2017 Autumn**

| Course | | Title | Attempted | Earned | Grade |
|---|---|---|---|---|---|
| LAW | 4005 | INTRODUCTION TO INTELLECTUAL PROPERTY | 4.00 | 4.00 | P |
| | | Lisa Ouellette | | | |
| LAW | 7038 | REMEDIES | 2.00 | 2.00 | H |
| | | Ariel Porat | | | |
| LAW | 7041 | STATUTORY INTERPRETATION | 3.00 | 3.00 | P |
| | | Jane Schacter | | | |

**2016-2017 Winter**

| Course | | Title | Attempted | Earned | Grade |
|---|---|---|---|---|---|
| LAW | 805T | POLICY PRACTICUM: CALIFORNIA PROP. 64 AND MARIJUANA POLICY | 3.00 | 3.00 | H |
| | | Keith Humphreys; Robert MacCoun | | | |
| LAW | 4017 | PROTECTION OF PERSONALITY: DEFAMATION, PRIVACY, AND EMOTIONAL DISTRESS | 3.00 | 3.00 | P |
| | | Robert Rabin | | | |
| LAW | 6001 | LEGAL ETHICS | 3.00 | 3.00 | P |
| | | Deborah Rhode | | | |
| LAW | 7026 | IMMIGRATION LAW, POLICY AND CONSTITUTIONAL RIGHTS | 3.00 | 3.00 | P |
| | | Lucas Guttentag | | | |

**2016-2017 Spring**

| Course | | Title | Attempted | Earned | Grade |
|---|---|---|---|---|---|
| LAW | 3004 | LAW AND BIOSCIENCES: GENETICS | 2.00 | 2.00 | P |
| | | Hank Greely | | | |
| LAW | 7019 | EMPLOYMENT DISCRIMINATION | 3.00 | 3.00 | P |
| | | Richard Ford | | | |
| LAW | 7821 | NEGOTIATION | 3.00 | 3.00 | MP |
| | | Janet Martinez; Linda Netsch | | | |
| LAW | 7833 | SPANISH FOR LAWYERS | 2.00 | 2.00 | MP |
| | | Cristina Dos Santos; Valicia Saucedo | | | |

END OF TRANSCRIPT

Key to Transcript

Send To: Cameron Brown

This document has been digitally signed and therefore contains special characteristics. A document that contains a digital signature can be instantly validated. See final page of this PDF for further explanation.

THE NAME AND OFFICIAL SEAL OF THE INSTITUTION APPEAR IN THE UPPER LEFT HAND CORNER OF THIS TRANSCRIPT

THIS DOCUMENT HAS BEEN DIGITALLY SIGNED AND CAN BE VALIDATED ELECTRONICALLY

- COPY OF CERTIFIED PDF -

KEY TO TRANSCRIPT ON FINAL PAGE

Crown Quadrangle
559 Nathan Abbott Way
Stanford, CA 94305-8610
Tel   650 723-2465
Fax   650 725-0253
info@law.stanford.edu
www.law.stanford.edu

**Stanford Law School's Grading System**

In the fall of 2008, Stanford Law School adopted the following grading system for all courses:

| H | Honors | Exceptional work, significantly superior to the average performance at the school |
|---|---|---|
| P | Pass | Representing successful mastery of the course material |
| MP | Mandatory Pass | Representing P or better work. (No Honors grades are available for Mandatory P classes.) |
| MPH | Mandatory Pass - Public Health Emergency* | Representing P or better work. (No Honors grades are available for Mandatory P classes.) |
| R | Restricted Credit | Representing work that is unsatisfactory |
| F | Fail | Representing work that does not show minimally adequate mastery of the material |
| L | Pass | Student has passed the class. Exact grade yet to be reported |
| I | Incomplete | |
| N | Continuing Course | |
| [blank] | | Grading Deadline has not yet passed. Grade has yet to be reported. |
| GNR | Grade Not Reported | Grading Deadline has passed. Grade has yet to be reported. |

In addition to the above grades, professors may award class prizes to recognize extraordinary performance in a particular course. These prizes are rare. No more than one prize may be awarded for every 15 students enrolled in the course. Outside of first-year required courses, awarding these prizes is at the discretion of the instructor. The five prizes, which will be noted on student transcripts, are:

- the Gerald Gunther Prize for first-year Legal Research & Writing,
- the Gerald Gunther Prize for exam classes,
- the John Hart Ely Prize for paper classes,
- the Hilmer Oehlmann, Jr Award for Federal Litigation or Federal Litigation in a Global Context, and
- the Judge Thelton E. Henderson Prize for clinical courses.

**Interpreting Stanford's Grades:**

Grading policies vary significantly from school to school. Other schools that have a similar system impose no limits on the number of Honors grades awarded. As a result, one might see 70-80% of a class receiving Honors. Stanford Law School, by comparison, imposes strict limitations on the percentage of Honors grades that professors may award. These vary slightly depending on the class, but employers should expect to see approximately one-third of our students receiving Honors in any exam class. For this reason, we strongly encourage employers who use grades as part of their hiring criteria to set standards specifically for Stanford students, and to consider grades in the context of other information about a candidate, such as faculty recommendations, pre-law school academic and professional experience, law school activities, and an interviewer's own impressions of the individual.

---

* The coronavirus outbreak caused substantial disruptions to academic life beginning in mid-March 2020, during the Winter Quarter exam period. Due to these circumstances, SLS used a Mandatory Pass-Public Health Emergency/Restricted Credit/Fail grading scale for all exam classes held during Winter Quarter 2020 and all classes held during Spring Quarter 2020.

For non-exam classes held during Winter Quarter (e.g., policy practicums, clinics, and paper classes), students could elect to receive grades on the normal H/P/Restricted Credit/Fail scale or the Mandatory Pass-Public Health Emergency/Restricted Credit/Fail scale.

Updated May 2020

OFFICE OF THE UNIVERSITY REGISTRAR

UNIVERSITY OF CALIFORNIA, DAVIS
OFFICIAL          PAGE: 1

CAMERON ANGEL BROWN

Name:

ID 994-598-314

Student:

UNDERGRADUATE ACADEMIC RECORD

DEGREE AWARDED: 14-JUN-12
BACHELOR OF ARTS
MAJOR(S): ECONOMICS
WITH: HONORS

ADMITTED: FALL QUARTER 2008

TRANSFER CREDIT:
AP MATH:CALCULUS BC              050B
  ADVANCED PLACEMENT EXAM                      8.00
AP ENGLISH:COMP & LIT            050B
  ADVANCED PLACEMENT EXAM                      8.00
AP BIOLOGY                       0507
  ADVANCED PLACEMENT EXAM                      8.00
CHAFFEY COLLEGE                  06/09-08/09
  JC TRANSFER                                  9.00
  COMMUNITY COLLEGE UNITS:                     9.00
  TOTAL TRANSFER UNITS ALLOWED:               33.00

INSTITUTION CREDIT:

FALL QUARTER 2008

CURRENT COLLEGE(S): BIOLOGICAL SCIENCES
  CURRENT MAJOR(S): BIOLOGICAL SCIENCES
DRAMART  010  INTRO TO ACTING         A   3.00  12.00
MUSIC    003A INTRO MUSIC THEORY I    A+  4.00  16.00
POL SCI  001  AMER NATL GOVT          A   4.00  16.00
STATIST  013  ELEMENTARY STATISTICS   A+  4.00  16.00
           COMPL  ATTM  PSSD   GPTS      GPA
TERM:     15.00  15.00  15.00  60.00    4.000
UC CUM:   15.00  15.00  15.00  60.00    4.000
  DEAN'S LIST, BIOLOGICAL SCIENCES

WINTER QUARTER 2009

ECON     001A PRINC OF MICROECON      A-  4.00  14.80
PHYS ED  001  BADMINTON-BEG           P    .50    .00
POL SCI  003  INTERNATL RELATIONS     B+  4.00  13.20
SPANISH  002  ELEMENTARY SPANISH      A   5.00  20.00
           COMPL  ATTM  PSSD   GPTS      GPA
TERM:     13.50  13.00  13.00  48.00    3.692
UC CUM:   28.50  28.00  28.00 108.00    3.857
  DEAN'S LIST, BIOLOGICAL SCIENCES

SPRING QUARTER 2009

CURRENT COLLEGE(S): LETTERS & SCIENCE
  CURRENT MAJOR(S): ECONOMICS
ECON     001B PRINC OF MACROECON      A   4.00  16.00
HUM DEV  012  HUMAN SEXUALITY         A-  3.00  11.10
MATH     016B SHORT CALCULUS          A   3.00  12.00
PHYS ED  001  WEIGHT TRAINING-BEG     P    .50    .00
SPANISH  003  ELEMENTARY SPANISH      A   5.00  20.00
           COMPL  ATTM  PSSD   GPTS      GPA
TERM:     15.50  15.00  15.00  59.10    3.940
UC CUM:   44.00  43.00  43.00 167.10    3.886
  DEAN'S LIST, LETTERS & SCIENCE

************ CONTINUED ON NEXT COLUMN ************

CONTINUED

FALL QUARTER 2009

ECON     100  INTERMED MICRO THEORY   A   4.00  16.00
HISTORY  010C 19TH-20TH CENTURY WORLD B+  4.00  13.20
SPANISH  021  INTER SPANISH           A   5.00  20.00
           COMPL  ATTM  PSSD   GPTS      GPA
TERM:     13.00  13.00  13.00  49.20    3.784
UC CUM:   57.00  56.00  56.00 216.30    3.862
  DEAN'S LIST, LETTERS & SCIENCE

WINTER QUARTER 2010

COMUNCN  001  INTRO PUBLIC SPEAKING   A-  4.00  14.80
ECON     101  INTERMED MACRO THEORY   A   4.00  16.00
SPANISH  008  ELEM SPANISH CONV       A   2.00   8.00
SPANISH  022  INTER SPANISH           A+  5.00  20.00
           COMPL  ATTM  PSSD   GPTS      GPA
TERM:     15.00  15.00  15.00  58.80    3.920
UC CUM:   72.00  71.00  71.00 275.10    3.874
  DEAN'S LIST, LETTERS & SCIENCE

SPRING QUARTER 2010

AGRESEC  018  BUSINESS LAW            A   4.00  16.00
ECON     102  ANALYSIS OF ECON DATA   A   4.00  16.00
ECON     135  MONEY AND BANKING       A-  4.00  14.80
EDUC     160A PEER COUNSELING         P   2.00    .00
EDUC     160B PEER COUNSELING ISSUES  P   2.00    .00
           COMPL  ATTM  PSSD   GPTS      GPA
TERM:     16.00  12.00  12.00  46.80    3.900
UC CUM:   88.00  83.00  83.00 321.90    3.878
  DEAN'S LIST, LETTERS & SCIENCE

FALL QUARTER 2010

ECON     134  FINANCIAL ECONOMICS     A   4.00  16.00
PHILOS   012  INTRO TO SYMBOL LOGIC   A   4.00  16.00
UWRITNG  001  EXPOSITORY WRITING      A   4.00  16.00
           COMPL  ATTM  PSSD   GPTS      GPA
TERM:     12.00  12.00  12.00  48.00    4.000
UC CUM:  100.00  95.00  95.00 369.90    3.893
  DEAN'S LIST, LETTERS & SCIENCE

WINTER QUARTER 2011

ECON     115B ECONOMIC DEVELOPMENT    A   4.00  16.00
ECON     132  HEALTH ECONOMICS        A   4.00  16.00
PHILOS   112  INTERMED SYMBOLIC LOGIC A+  4.00  16.00
           COMPL  ATTM  PSSD   GPTS      GPA
TERM:     12.00  12.00  12.00  48.00    4.000
UC CUM:  112.00 107.00 107.00 417.90    3.905
  DEAN'S LIST, LETTERS & SCIENCE

SPRING QUARTER 2011

CM&RGDE  002  ETHNICITY AMER COMM     A   4.00  16.00
ECON     110B WORLD ECONOMIC HISTORY  A   4.00  16.00
ECON     122  GAME THEORY             B+  4.00  13.20
EDUC     160B PEER COUNSELING ISSUES  P   2.00    .00
EDUC     198  DIRECTED GROUP STUDY    P   2.00    .00
           COMPL  ATTM  PSSD   GPTS      GPA
TERM:     16.00  12.00  12.00  45.20    3.766
UC CUM:  128.00 119.00 119.00 463.10    3.891
  DEAN'S LIST, LETTERS & SCIENCE

********* CONTINUED ON PAGE    2 ************

TRANSCRIPT OF:

CAMERON ANGEL BROWN

THIS INFORMATION HAS BEEN RELEASED IN ACCORDANCE WITH THE
RIGHTS AND PRIVACY ACT OF 1974 AND CANNOT BE RELEASED TO
ANOTHER PARTY WITHOUT THE WRITTEN CONSENT OF THE STUDENT

ISSUED TO:

CAMERON BROWN
5212 MINTURN AVENUE
LAKEWOOD, CA 90712-2312



ACADEMIC TRANSCRIPT

This transcript is printed on special security paper with a
blue background, the seal of the University of California,
Davis, and the signature of the University Registrar,
Elias S. Lopez. This is an official sealed instrument; a
raised seal is not required.



Legal Seal                          University Registrar

D6792 (12/11)M

** NOT OFFICIAL WITHOUT SEAL AND SIGNATURE **

OFFICE OF THE UNIVERSITY REGISTRAR

UNIVERSITY OF CALIFORNIA, DAVIS
OFFICIAL        PAGE: 2

CAMERON ANGEL BROWN

Name:                                                   Student:

ID 994-598-314

| COURSE | NUMBER | TITLE | GRADE | UNITS | GRD | PTS | COURSE | NUMBER | TITLE | GRADE | UNITS | GRD | PTS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

INSTITUTION INFORMATION CONTINUED:

SUMMER SPECIAL SESSION 2011

```
N A STD   120  ETHNO SO AM IND        A    4.00   16.00
N A STD   198  DIRECTED GP STUDY      P    4.00     .00
              COMPL    ATTM    PSSD    GPTS        GPA
TERM:         8.00    4.00    4.00   16.00       4.000
UC CUM:     136.00  123.00  123.00  479.10       3.895

              FALL QUARTER 2011
HISTORY   191D DC-ART&ARCH&URBANSM    A    4.00   16.00
UC WASH   192  INTERNSHIP IN WASHINGTON P 7.00     .00
UC WASH   193  WASHINGTON CTR RESEARCH A  4.00   16.00
              COMPL    ATTM    PSSD    GPTS        GPA
TERM:        15.00    8.00    8.00   32.00       4.000
UC CUM:     151.00  131.00  131.00  511.10       3.901

              WINTER QUARTER 2012
ECON      131  PUBLIC FINANCE         A    4.00   16.00
MATH      016C SHORT CALCULUS         A    3.00   12.00
UWRITNG   104A REPORTS AND TECH WRITING A 4.00   16.00
              COMPL    ATTM    PSSD    GPTS        GPA
TERM:        11.00   11.00   11.00   44.00       4.000
UC CUM:     162.00  142.00  142.00  555.10       3.909

              SPRING QUARTER 2012
ECON      140  ECONOMETRICS           P*   4.00     .00
ENGLISH   005F WRITING: FICTION       A    4.00   16.00
PHYS ED   001  BOWLING - BEG/INT      P     .50     .00
PHYS ED   001  TENNIS-BEG             P     .50     .00
SCI&SOC   040  PHOTOGRAPHY, ART & SCIEN A 3.00   12.00
              COMPL    ATTM    PSSD    GPTS        GPA
TERM:        12.00    7.00    7.00   28.00       4.000
UC CUM:     174.00  149.00  149.00  583.10       3.913
```

***************** TRANSCRIPT TOTALS ******************

TOTAL UNITS COMPLETED: 207.00      UC GPA: 3.913
UC BALANCE POINTS: 285.1

STUDENT IN GOOD ACADEMIC STANDING

COMMENTS:
*** ACADEMIC EXPERIENCES ***
INTERNSHIP-DISTRICT OF COLUMBIA PUBLIC SCHOOLS,
PUBLIC EDUCATION, RESEARCH INTERN, FALL 2011.
ENROLLED IN WASHINGTON DC PROGRAM, FALL 2011.

******************* MEMORANDA ********************
UNIVERSITY REQUIREMENTS:
 ELWR: SATISFIED              03/24/08
 AMERICAN HIST/INST - SATISFIED 03/24/08
HIGH SCHOOL: ETIWANDA HIGH SCHOOL JUN-08

              END OF RECORD
OFFICIAL UC DAVIS TRANSCRIPT COMPUTER PRODUCED ON
01/07/13

TRANSCRIPT OF:
        CAMERON ANGEL BROWN

THIS INFORMATION HAS BEEN RELEASED IN ACCORDANCE WITH THE
RIGHTS AND PRIVACY ACT OF 1974 AND CANNOT BE RELEASED TO
ANOTHER PARTY WITHOUT THE WRITTEN CONSENT OF THE STUDENT.

ISSUED TO:
        CAMERON BROWN
        5212 MINTURN AVENUE
        LAKEWOOD, CA 90712-2312



ACADEMIC TRANSCRIPT
This transcript is printed on special security paper with a
blue background, the seal of the University of California,
Davis, and the signature of the University Registrar,
Elias S. Lopez. This is an official sealed instrument; a
raised seal is not required.

Legal Seal          University Registrar

D6792 (12/11)M              ** NOT OFFICIAL WITHOUT SEAL AND SIGNATURE **

EXHIBIT B

**Before JAMS – Washington, D.C.**


**Cameron A. Brown**, Claimant

v.

**Paul Hastings LLP**,
**Adele Maloney** (General Counsel, Paul Hastings LLP),
**Kwame Manley** (Global Chair of Litigation, Paul Hastings LLP),
**Brad Bondi** (Global Co-Chair of Investigations and White Collar Defense, Paul Hastings LLP),
**Ronald Angus** (Partner, Paul Hastings LLP),
**Neil Schumacher** (Of Counsel, Paul Hastings LLP),

**Respondents.**

## Arbitration Demand

### <u>Introduction</u>

This Demand for Arbitration arises from egregious misconduct by Paul Hastings LLP, Partner Brad Bondi, and Of Counsel Neil Schumacher—conduct that violated both the law and basic principles of professional integrity.

Cameron A. Brown ("Brown"), a Black, gay attorney and Associate at Paul Hastings, faced disparate treatment, retaliation, a hostile work environment, constructive discharge, and a breach of contractual confidentiality. These actions were designed to eviscerate his career, built through a lifetime of dedication and achievement, and to silence his advocacy for equitable advancement—all within the span of a few months.

At its core, this case reflects a clash between advocacy and institutional power, where requests for fairness were met not with engagement but with retaliation, isolation, sabotage, and selective enforcement of internal policies, and ultimately, the unlawful disclosure of confidential employment information. That disclosure sabotaged a career-defining opportunity, leaving Brown unable to correct the record or defend his reputation due to the very confidentiality obligations Paul Hastings weaponized against him.

This arbitration is filed pursuant to Section 9(a) of the Confidential Transition Agreement and General Release, executed between Brown and Paul Hastings LLP on March 27, 2025, attached as Exhibit A. That agreement mandates that any and all disputes arising out of or related to Brown's employment, separation, or the agreement itself be resolved through final and binding arbitration before JAMS in Washington, D.C. The core purpose of this agreement was to protect Brown's professional reputation during a vulnerable period of transition—a purpose that has been undeniably frustrated by Paul Hastings' intentional or reckless disregard for confidentiality.

While the agreement includes a contingent non-suit provision under Section 5, that clause is expressly voided upon a material breach by Paul Hastings. The Firm's unauthorized disclosure of Brown's employment status—in direct violation of Section 6(d)—constitutes such a breach, nullifying any limitation on Brown's right to pursue arbitration. Section 3 of the Agreement further permits truthful statements in legal proceedings, and this demand falls squarely within that carve-out. Accordingly, Brown's assertions here—including those concerning disparate treatment, retaliation, breach of confidentiality, and career damages—are fully protected.

There is no requirement under the agreement or JAMS rules that arbitration proceedings remain confidential, nor does filing this demand constitute any breach of the agreement. To the contrary, Paul Hastings' own breach—allowing the precise employment status the agreement was designed to safeguard to reach a third party—cannot serve as a shield to invalidate the remaining provisions of the agreement. Paul Hastings remains bound by its obligations, including its non-disparagement and payment terms, and is barred from taking additional adverse actions against Brown in retaliation for this filing. Paul Hastings and key individuals within its leadership—General Counsel Adele Maloney, Global Chair of Litigation Kwame Manley, Global Co-Chair of Investigations and White Collar Defense Brad Bondi, Partner Ronald Angus, and Of Counsel Neil Schumacher—chose to breach that agreement, retaliate against protected activity, and interfere with Brown's ability to secure future employment. Their conduct did not occur in isolation; it was part of a broader culture at Paul Hastings where dissenting voices—particularly those of diverse attorneys advocating for equitable treatment—were silenced through covert retaliation cloaked in the veneer of pretext and formal process.

The claims asserted in this arbitration include breach of contract (confidentiality and non-disparagement), retaliation in violation of the D.C. Human Rights Act, constructive discharge, hostile work environment, fraudulent inducement and misrepresentation based on Paul Hastings' false diversity commitments, tortious interference with prospective economic advantage, and failure to mitigate harm. These claims collectively arise from Paul Hastings' deliberate campaign to marginalize and silence Brown, culminating in the unlawful disclosure of confidential employment information that sabotaged his candidacy for a career-defining role at AlphaSense, Inc.—a late-stage, pre-IPO AI-driven market intelligence firm trusted by over 4,000 enterprise clients, including the majority of the S&P 500. Brown was rejected solely because AlphaSense received confidential information from Paul Hastings that Brown was on "administrative leave," extinguishing a lucrative in-house counsel role offering $200,000+ in base salary, $100,000+ in pre-IPO equity, bonuses, remote flexibility, and a clear path to executive leadership. This arbitration seeks to hold Paul Hastings fully accountable for the irreparable harm inflicted on Brown's career and reputation.

This arbitration seeks not only compensatory and punitive damages but also declaratory relief to hold Paul Hastings and its leadership accountable for their willful disregard of contractual and legal obligations. They shattered the protections afforded by the Transition Agreement, silenced Brown under threat of enforcement, and yet permitted his confidential information to circulate freely—crippling his career while denying him the tools to defend it.

Paul Hastings turned the protective shield of confidentiality into a sword, and this arbitration demands justice.

## Claims Asserted

### Claim 1: Breach of Contract (Confidentiality & Non-Disparagement)

Paul Hastings' breach became undeniable during Brown's candidacy for a Senior Counsel, Litigation & Commercial role at AlphaSense, Inc., a leading AI-driven market intelligence company. AlphaSense, a powerhouse relied upon by over 4,000 enterprise customers including the majority of the S&P 500, was offering Brown a career-defining role: a fully remote leadership position, overseeing complex litigation and commercial matters, with a compensation package of $200,000+ in base salary, not including other benefits, performance bonuses, and $100,000+ in pre-IPO equity. The role was not just a job; it was the first of its kind at AlphaSense, an opportunity to build the litigation function from the ground up, with a direct path to executive leadership.

Brown advanced through every stage of the hiring process, with strong feedback from all interviewers. But just as the process neared completion, Herbert Wang, AlphaSense's Vice President of Legal, personally delivered the blow. He informed Brown that his references had been uniformly positive, yet reliable information had surfaced that Brown was on "administrative leave" from Paul Hastings. That single piece of confidential information—leaked from Paul Hastings—was the sole reason for the rejection.

In response, Brown denied the assertion. Bound by confidentiality and with no legitimate basis to confirm or deny the Firm's internal machinations, he affirmed his active employment at Paul Hastings and directed Herbert Wang to Adele Maloney and Kwame Manley for verification. At no point did Brown breach his obligations under the Transition Agreement. He upheld his end of the contract even as Paul Hastings undermined it. But the damage was done. AlphaSense, relying on information that only Paul Hastings could have leaked, rejected Brown at the eleventh hour, extinguishing a role that would have elevated him into in-house leadership, delivered substantial compensation, and advanced his career toward executive-level litigation oversight.

Paul Hastings engineered this sabotage while holding Brown under the gag order of confidentiality. Their material breach of Section 6(d) was not speculative—it was direct, corroborated by AlphaSense, and devastating in its impact. The paid leave status disclosed was not a benign fact—it was an internal employment matter, confirmed by Adele Maloney's January 31, 2025 email, which detailed Brown's placement on paid leave, termination of Firm access, and exclusion from client matters. These facts were never meant to see daylight, and yet they surfaced in the most damaging context possible.

The breach was not speculative. The specificity of the disclosed status—paid leave/administrative leave—could only have originated from Paul Hastings or its agents. A mere passerby, peripheral staff member, or employee—even one observing Brown's furnished, decorated, but unoccupied office—would lack both the context and authority to glean his precise employment status. Such information would not simply "float in the ether" and somehow reach the Vice President of Legal at AlphaSense, a fully remote company headquartered in New York, with no legal staff stationed in Washington, D.C. Wang's admission that he was informed by a "reliable source" reinforces that this information flowed directly or indirectly from the Firm. His

further acknowledgment that the negative inference derived from this confidential information was the sole factor driving the rejection eliminates any doubt as to causation.

Under D.C. contract law, this constitutes a material breach. The Firm frustrated the essential purpose of the agreement: protecting Brown's reputation and transition. As a direct and foreseeable consequence of Paul Hastings' breach, Brown lost:

1. Annual compensation exceeding $375,000, including salary, benefits, bonus, and equity,
2. A career-defining leadership role at a premier AI company, and
3. His professional standing in the legal market, damaged by a leak he was contractually barred from addressing.

Paul Hastings cannot hide behind the contract it violated. The Firm must be held fully accountable for weaponizing confidentiality, destroying Brown's opportunity, and fracturing his career. When a multinational, billion-dollar institution imposes silence on an employee while leveraging backchannels to dismantle that employee's future prospects, the imbalance of power is absolute. Wang's admission—a rare crack in the façade of corporate discretion—offered a clear glimpse into the shadowed reality of hiring decisions. Paul Hastings likely assumed its invisible influence would never surface, even as final-round rejections piled up without objective justification. While Bondi wasn't caught red-handed, his invisible hand remained at work, just as it did within the Firm—reaching beyond its walls to shape Brown's opportunities and constrict his future.

### Claim 2: Retaliation (D.C. Human Rights Act, Title VII, and 42 U.S.C. § 1981)

The retaliation Brown endured at Paul Hastings LLP was neither isolated nor incidental—it was a methodical campaign of professional destruction, escalating the moment Brown dared to challenge the status quo. His protected activity—advocating for equitable advancement and questioning the opaque barriers faced by diverse attorneys—threatened the entrenched power structures of the Firm. In a highly politicized, hierarchical environment, such dissent is not met with dialogue but with retribution.

Brown's advocacy was clear: he raised legitimate concerns about (1) disparate treatment within the litigation department, (2) the absence of advancement pathways for diverse attorneys, and (3) his own eligibility for Of Counsel status—an elevation warranted by his exceptional work product, which even Brad Bondi had consistently praised.

But once Brown raised these concerns, the tone shifted swiftly. Promotion discussions stalled without explanation. Assignments disappeared, cutting off the lifeblood of billable hours. Kwame Manley, once collegial, turned cold, retreating behind pressure tactics and stonewalling. The Firm began to erase Brown's presence—not with an overt termination, but with strategic isolation.

The retaliation deepened when Paul Hastings weaponized internal policies, namely the AI policy, which was selectively enforced. While white heterosexual colleagues leveraged AI tools freely, Brown's use became the pretext for scrutiny. The policy, applied nowhere else, became a sword drawn only against him—masking retaliation under the veneer of compliance.

The climax of this campaign came when Brown was placed on paid leave—not for any substantiated misconduct, but for fabricated performance issues, and a "loss in trust". His access revoked, client matters reassigned, professional standing dismantled. Raise your voice, and we will silence you—that was the Firm's message.

But Paul Hastings' retaliation did not end at the door. It followed Brown into the market, sabotaging his future. The breach of confidentiality that torpedoed Brown's opportunity at AlphaSense, Inc.—where he stood on the brink of a career-defining role—was not a separate act but the final strike in the Firm's retaliation. Brown was forced to watch his career collapse in silence, bound by the very confidentiality the Firm had already breached.

This orchestrated retaliation—spanning stonewalling, isolation, selective policy enforcement, and external sabotage—meets every standard of retaliation under the D.C. Human Rights Act and common law. Brown's protected activity was met with escalating adverse actions, designed to break his career, all because he dared to demand fairness. These actions constitute unlawful retaliation under DCHRA, Title VII, and § 1981, each of which prohibits adverse actions against individuals for engaging in protected conduct, including advocacy for workplace equity based on race and sexual orientation.

## Claim 3: Constructive Discharge / Wrongful Termination
### (D.C. Human Rights Act, Title VII of the Civil Rights Act, and 42 U.S.C. § 1981)

Paul Hastings LLP never formally terminated Brown—but that formality is irrelevant. The Firm's conduct left Brown no reasonable alternative but to resign. This was a constructive discharge in all but name, engineered through a deliberate campaign of sabotage, isolation, micromanagement, and manufactured performance issues designed to make his continued employment intolerable and create conditions so untenable that any misstep, however minor, could be weaponized as justification for his removal.

Constructive discharge occurs where an employer deliberately creates working conditions so intolerable that a reasonable person would feel compelled to resign. Under D.C. and federal law, constructive discharge based on race, sexual orientation, or protected activity (including advocacy for equity) constitutes wrongful termination. The D.C. Human Rights Act and common law recognize that an employer cannot escape liability simply by avoiding a formal firing while driving an employee out the door. Paul Hastings did exactly that. Following Brown's protected advocacy for workplace equity and promotion alignment, the Firm orchestrated a systematic campaign to isolate him. The process unfolded in stages.

First, Brown's reputation and work product came under calculated assault. Despite consistent positive feedback, his contributions were suddenly and unreasonably criticized, often without merit. Brad Bondi, who had previously offered nothing but praise, shifted dramatically—publicly criticizing Brown in front of a senior partner, Meredith, during their very first meeting.

In one striking example, Brown prepared comprehensive research that directly satisfied a prospective client in a high-stakes meeting. Yet Bondi allowed others at the table to present

Brown's work while silencing Brown himself—denying him the opportunity to speak in the very forum his work had enabled. After the meeting, rather than acknowledge Brown's contributions, Bondi berated him for the work, marking the first major shift in tone.

When Brown respectfully raised concerns—noting that he had circulated research seven days prior to a client meeting yet was given no opportunity to hear Bondi's thoughts, feedback, or questions until the morning of the meeting itself—Bondi's reaction was immediate and hostile. Rather than engage in dialogue, Bondi berated Brown, calling him argumentative, and from that moment, ceased direct communication for thirty days. Brown had merely requested reasonable notice and collaboration, seeking only the opportunity to discuss and refine his work before high-stakes client interactions.

From there, the retaliation intensified. Brown was subjected to conflicting, high-volume assignments, given competing deadlines, and then criticized regardless of performance, even when he delivered exactly what was requested. Finally, the exclusion became unmistakable. For thirty consecutive days, Brown received no new assignments—a deliberate sidelining designed to isolate him professionally, erode his billable hours, and signal his displacement from the team. This prolonged exclusion laid the foundation for what followed.

Throughout this period, Brown did not remain passive. Recognizing the professional isolation, he reached out directly to Kwame Manley, expressing concern that he had fallen from favor and seeking reassurance that opportunities still existed outside of Brad Bondi's control. Manley assured Brown that he could reengage with other partners, encouraging him to make himself available across the broader Complex Litigation and Investigations group. Brown took him at his word and acted decisively. Over the course of sixty days, he contacted more than a dozen partners across multiple offices and states, along with two separate practice development staff within different large practice groups. Despite these efforts, no partner offered him any work. His outreach was met with silence, underscoring that the decision to marginalize him was not incidental but orchestrated.

Ultimately, Manley redirected Brown back to Angus under the pretense that this would shield him from Bondi and Neil Schumacher. In reality, this maneuver placed Brown back under the direct supervision of the very individuals who had engineered his exclusion from the outset. It was under this rearranged structure that new criticisms emerged—never-before-mentioned claims that Brown had failed to adequately review the work of junior associates and claims that Brown offered no help to partners Brad and Ronnie who both claimed to be working "4,000 hours per month". These allegations arose suddenly, without prior notice or documentation, in stark contrast to the positive evaluations Brown had received earlier in his tenure.

The orchestrated nature of the Firm's campaign became even more apparent as Brown was abruptly assigned a crushing volume of work. After weeks of receiving no substantive assignments, he was suddenly tasked with four major motions and a deposition within the same week. This surge of responsibilities was designed to overwhelm him, creating conditions where even the most diligent effort would falter. While Brown worked tirelessly under these unreasonable demands—a mistake that passed through multiple rounds of partner and associate review, including scrutiny from Neil, Ronnie, and Brad—was permitted to remain uncorrected for

days and several draft iterations. When the mistake was finally acknowledged, the blame fell squarely and solely on Brown. This scapegoating, after a deliberate campaign of marginalization and sabotage, crystallized the Firm's intent: to discredit Brown's work, undermine his professional standing, and justify his eventual removal.

That removal came on January 29, 2025, when Paul Hastings placed Brown on paid leave, a fact confirmed by Adele Maloney's email. Though the Firm avoided the term "administrative leave," the reality was unmistakable. Brown's system access was revoked, his client matters reassigned, and all of his professional responsibilities stripped away. Functionally expelled yet technically retained on payroll, Brown was left in professional limbo—neutralized but visible, silenced but employed, his career dismantled under the guise of procedural propriety.

These conditions amounted to constructive discharge under both federal and D.C. law, violating Brown's rights and professional dignity. Paul Hastings' leadership deliberately engineered this environment to force Brown's exit for challenging inequity—a wrongful termination in all but name.

This constructive discharge was retaliatory and pretextual. The AI misuse allegations that served as justification were contrived, applied inconsistently across the Firm. While white heterosexual colleagues engaged with AI tools without incident, Brown's use became the pretext for his removal. The damage of this wrongful termination cannot be overstated: Brown was forcibly separated from his career trajectory within BigLaw. His market reputation was left in limbo, unable to explain his departure due to confidentiality restrictions.

This culminated in the AlphaSense rejection, which was predicated on the Firm's own breach. Under the D.C. Human Rights Act and common law, Paul Hastings is liable for constructive discharge and wrongful termination. They engineered Brown's exit, leaving him with no choice but to accept separation—all while retaining control over the narrative and silencing Brown under the very agreement they breached.

## Claim 4: Fraudulent Inducement

Paul Hastings LLP, through its leadership and recruitment practices, knowingly misrepresented material facts to Cameron A. Brown to induce his acceptance of employment—fully aware that these assurances would not be honored. This conduct constitutes fraudulent inducement under D.C. common law, encompassing both internal representations made during Brown's recruitment and external marketing statements made to the broader legal community.

During the fall of 2024, Brown was actively recruited by Kwame Manley, Global Chair of Litigation, and Jason Fiebig, a junior partner and one of the firm's most recently elevated Black partners. Manley and Fiebig explicitly represented that Paul Hastings offered a supportive environment for Black attorneys, led by Black partners in "positions of power" who were personally invested in the success and advancement of Black associates. Brown was encouraged to select Paul Hastings over competing offers—including multiple in-house roles at leading technology companies—based on these representations of mentorship alignment, support, and genuine opportunities for equitable advancement.

Additionally, Paul Hastings represented that Brown would have broad exposure to varied workstreams, collaborating with multiple partners across Litigation and White Collar Investigations, allowing him to build a diverse, robust practice. These were not general statements of firm culture or puffery. They were specific assurances made to induce Brown's reliance, directly tied to his mentorship needs, career development goals, and identity alignment.

Yet these representations unraveled immediately upon Brown's arrival at the firm. There was no formal onboarding, no mentorship meetings, no integration into the broader team. Communication from both Fiebig and Manley amounted to cursory exchanges at best. Instead, Brown was siloed exclusively under Brad Bondi, who exercised total control over Brown's workstream and ensured that all billable hours flowed solely through Bondi's matters. Despite Brown's repeated efforts to expand his caseload, including his expressed interest in broadening his practice, Bondi blocked every opportunity outside of his own sphere—including one large investigation, long before any performance-related allegations arose.

These internal misrepresentations were made either with knowledge of their falsity or with reckless disregard for their truth. Bondi's monopoly over workstreams and treatment of associates was widely known within the firm. Manley and Fiebig, despite positioning themselves as mentorship advocates, took no meaningful steps to engage or support Brown once he joined. In effect, Brown was recruited under a false diversity framework—a veneer of inclusion masking hollow, performative commitments.

Paul Hastings' external DEI messaging compounds this fraud. The firm has long marketed itself as a leader in diversity, once promoting a 1L Diversity Scholarship aimed at advancing underrepresented attorneys. When Brown joined in fall 2024, the diversity scholarship still existed. As of today, this program had been rebranded as the Paul Hastings Fellowship, with its overt references to race, gender, and identity stripped away, replaced by generic language about "community, opportunity, and inclusion." This rebranding mirrors industry trends responding to DEI backlash, but it is telling that Paul Hastings—unlike firms with similar programs—has avoided public scrutiny from the Trump Administration, the U.S. Attorney's Office, or other political actors hostile to law firms with historic commitments to diversity initiatives.

Let there be no mistake: Cameron A. Brown was not a "diversity hire", nor was he afforded preferential treatment in hiring due to any of his protected statuses. His record speaks for itself. Brown's career is built on a foundation of academic excellence and professional achievement that stands independent of any diversity initiatives. He graduated from the University of California, Davis, a top public research institution, with a 3.91 GPA in Economics—a discipline renowned for its rigorous quantitative demands and curve-graded courses. He earned Honors from the Economics department, graduated cum laude, and was inducted into Phi Beta Kappa, the nation's most prestigious academic honor society. Brown scored above the 90th percentile on the Law School Admissions Test (LSAT) and was admitted to 12 of the 13 top law schools, including Harvard Law School, the alma mater of Brad Bondi himself. He received four scholarship offers to attend law school, the most prestigious being the Rubenstein Scholarship at the University of Chicago—a full tuition and living stipend package valued at over $180,000, which he declined to attend Stanford Law School, his institution of choice.

At Stanford, Brown excelled immediately. In his first quarter, he earned Honors (reserved for the top 30% of students—the highest grade awarded) in multiple of his graded courses. His performance in Legal Research and Writing so impressed his professor that he received a personal recommendation for an externship with the Honorable Justice Mariano-Florentino Cuéllar of the California Supreme Court. Despite these accolades, Brown made a deliberate, selfless choice: he joined Paul, Weiss, Rifkind, Wharton & Garrison LLP as a summer associate to maximize his earnings potential in order to support his disabled mother, who remained unemployed throughout his law school tenure. Brown's path has never been easy. He has consistently overcome significant personal and systemic obstacles—yet he has done so with distinction at every stage.

The disconnect between Paul Hastings' external messaging and internal practice is not a matter of corporate branding—it is fraud. The firm knowingly presented a false narrative to attract diverse legal talent, inducing reliance on public statements and internal representations to the detriment of individuals like Brown. He reasonably relied on Paul Hastings' professed values—codified in its fellowship programs, public statements, and recruitment pitches—only to find that those commitments were surface-level, masking a culture resistant to genuine inclusion.

This reliance resulted in significant damages. Brown rejected competing offers that would have provided genuine mentorship and professional advancement, only to endure sabotage, professional isolation, retaliation, and constructive discharge. The firm's actions caused both economic losses—including lost earnings, equity opportunities, and career trajectory disruption—and emotional distress from the isolation, hostility, and eventual breach of confidentiality that sabotaged his candidacy with AlphaSense.

These facts satisfy fraudulent inducement and misrepresentation under D.C. law:

1. Material misrepresentations regarding mentorship, work opportunities, and DEI culture.
2. Knowledge of falsity or reckless disregard by Paul Hastings leadership.
3. Intent to induce reliance, persuading Brown to accept their offer.
4. Actual, reasonable reliance by Brown.
5. Resulting damages, economic and emotional.

Accordingly, Brown seeks compensatory and punitive damages arising from Paul Hastings' fraudulent inducement and misrepresentation, further underscoring the firm's broader liability for retaliation and breach.

### Claim 6: Hostile Work Environment
### (D.C. Human Rights Act, Title VII, and 42 U.S.C. § 1981)

The environment that Paul Hastings LLP fostered for Brown was hostile by design—calculated to marginalize, isolate, and ultimately expel him for daring to seek fairness and recognition. This was no isolated incident of poor management. This was a sustained campaign rooted in bias, retaliation, and the silencing of diverse voices within the Firm.

9

The D.C. Human Rights Act prohibits creating a hostile work environment based on race, sexual orientation, and other protected characteristics. Under this standard, the cumulative effect of the Firm's actions must be measured—not merely individual episodes. Here, the pattern and severity of Paul Hastings' conduct left Brown to navigate an intolerable workplace, one where his very identity made him a target. Brown, a Black, gay attorney, advocated for equitable treatment and promotion alignment. These were reasonable, professional requests—consistent with Firm values on paper. But within the actual culture of Paul Hastings, these requests were met with hostility, stonewalling, and isolation.

The environment became increasingly toxic under the leadership of Brad Bondi, Global Co-Chair of Investigations and White Collar Defense, whose political affiliations and cultural leanings helped shape a space where diverse attorneys were second-guessed, sidelined, or forced out. Bondi's deep ties to far-right political circles, including his sister US Attorney General Pam Bondi's connection to President Donald Trump, reflect an environment where claiming space as a Black, gay professional was a risk.

The hostility manifested repeatedly:

1. Brown's promotion pathway was blocked without explanation, despite documented excellence.
2. Work assignments dwindled, closing off the natural channels for advancement.
3. Leadership engagement ceased, leaving Brown professionally adrift.
4. Policy enforcement became selective, with AI policies weaponized to justify disciplinary measures against Brown alone.

Ultimately, Brown was placed on paid leave—a de facto expulsion thinly veiled as compliance with internal procedures. The Firm's leadership, including Kwame Manley, Ronald Angus, and Neil Schumacher, were complicit in maintaining this hostile environment. Whether through active participation or willful silence, they ensured that Brown remained isolated and professionally stifled. This hostile work environment was not merely unpleasant—it was unlivable. It forced Brown to endure:

1. The loss of career opportunities simply because he refused to accept marginalization.
2. Professional isolation,
3. Emotional strain.

Paul Hastings must be held liable under the D.C. Human Rights Act for creating a workplace where Brown's identity and advocacy for fairness became grounds for punishment. Under Title VII and § 1981, it is unlawful for an employer to create or perpetuate a hostile work environment on the basis of race or protected conduct. Paul Hastings' leadership—specifically Brad Bondi and Ronald Angus—engineered such conditions in retaliation for Brown's efforts to challenge inequity, thereby violating both federal and D.C. law.

**Claim 7: Tortious Interference with Prospective Economic Advantage**

Paul Hastings LLP's misconduct did not simply violate contractual obligations, it intentionally sabotaged Brown's ability to secure a career-defining opportunity at AlphaSense, Inc. constituting tortious interference with prospective economic advantage under D.C. common law. At the time of the breach, Brown had established a clear, imminent business relationship with AlphaSense, a late-stage, pre-IPO market intelligence firm serving over 4,000 enterprise clients, including the majority of the S&P 500. Brown had advanced through every stage of the hiring process for a Senior Counsel, Litigation & Commercial role, receiving glowing feedback from every interviewer. His references were uniformly positive, and the offer was imminent.

The role was unique:

- A first-of-its-kind litigation leadership position at AlphaSense,
- Offering $200,000+ base salary, benefits, performance bonuses, and pre-IPO equity,
- With clear advancement to executive leadership and significant equity upside post-IPO.

This was a prospective economic relationship of substantial value, which Paul Hastings knew or should have known existed. Even if the Firm did not know the specific employer, it understood the context of the Agreement: Brown was transitioning to new employment, and the Agreement's confidentiality provisions were designed specifically to protect his future opportunities.

By disclosing or allowing disclosure of Brown's confidential employment status—his paid leave (administrative leave)—Paul Hastings intentionally interfered with that prospective opportunity. This was not a passive error. The specificity of the leaked information, combined with Herbert Wang's admission that this single disclosure torpedoed the offer, makes it clear that Paul Hastings' conduct directly caused the collapse of this relationship.

The elements of tortious interference are satisfied:

1. Existence of a valid business expectancy: Brown's advanced candidacy at AlphaSense, near offer stage.
2. Knowledge of the relationship: Paul Hastings was fully aware of Brown's market pursuits, which the Agreement was intended to protect.
3. Intentional interference: PH disclosed confidential employment status with reckless disregard for its consequences.
4. Damages directly resulting from interference: Brown lost the offer entirely, forfeiting $2.5 million+ in compensation and equity, with additional career trajectory losses.

This was not mere negligence. Paul Hastings knew the purpose of the confidentiality provisions—and knew the damage disclosure would cause. The Firm intentionally interfered, causing foreseeable, catastrophic harm to Brown's economic future.

For this intentional tort, Brown seeks compensatory damages for economic loss, reputational harm, and career trajectory disruption, as well as punitive damages for reckless disregard of his rights.

### Claim 8: Failure to Mitigate Harm (Post-Breach Conduct)

Paul Hastings LLP's breach of confidentiality triggered significant and foreseeable harm to Brown's career. But the Firm's failure to mitigate that harm—even after being placed on notice—compounded the damage and reflects an ongoing disregard for its obligations under the Confidential Transition Agreement.

Immediately following AlphaSense's rejection, which was predicated solely on the disclosure of Brown's confidential employment status, Brown took prompt and reasonable steps to give Paul Hastings an opportunity to correct the situation. Upon being informed by Herbert Wang, AlphaSense's Vice President of Legal, that his employment status at Paul Hastings was the sole reason for the rescinded opportunity, Brown:

1. Denied the assertion, as required under the strict confidentiality obligations of the Transition Agreement, and
2. Directed AlphaSense to Adele Maloney (General Counsel) and Kwame Manley (Global Chair of Litigation) for accurate verification, affording Paul Hastings a clear opportunity to intervene and correct the record.

Brown also notified Adele Maloney, Kwame Manley, and his legal counsel, alerting the Firm to the breach and the resulting harm. Paul Hastings refused to act. The Firm chose silence, neither confirming nor denying the disclosure, nor taking any steps to mitigate the reputational and economic harm that had been caused.

This failure to act violates the most basic principles of contract law. Once a breach occurs, the breaching party has a duty to take reasonable steps to mitigate damages. This includes:

- Clarifying misinformation,
- Correcting false assumptions, and
- Preventing further harm from compounding.

Paul Hastings did none of this. Instead, the Firm allowed the market to assume the worst, knowing full well that Brown's career prospects depended on confidentiality. This inertia allowed AlphaSense's decision to stand unchallenged, destroying a lucrative opportunity and irreparably damaging Brown's professional standing.

The damages flowing from this failure to mitigate are not speculative. They include:

- The complete loss of a $2.5 million+ opportunity at AlphaSense,
- Additional career trajectory losses, estimated at $2.5 million or more, and
- The ongoing reputational harm caused by the Firm's refusal to intervene.

Paul Hastings' failure to mitigate was not accidental. It was a deliberate continuation of the Firm's retaliatory conduct, a willful refusal to repair the damage they caused, leaving Brown to suffer the consequences alone, while bound by confidentiality.

Paul Hastings is fully liable for all damages flowing from its breach and failure to mitigate, and this claim demands full accountability for the harm compounded by that inaction.

## Statement of Facts

At the heart of this dispute are two individuals whose paths crossed within the walls of Paul Hastings LLP, yet whose visions for leadership and workplace equity diverged sharply.

Cameron A. Brown is a Stanford Law School graduate with Honors distinctions, a former federal law clerk, and a skilled litigator with experience spanning BigLaw, the U.S. Department of Justice, and the federal judiciary. Across roles at Williams & Connolly, Paul, Weiss, and DOJ's Consumer Protection Branch, he built a reputation for navigating complex litigation, mitigating risk for Fortune 500 clients, and driving regulatory enforcement actions. His career has been defined by strategic thinking, legal acumen, and an unwavering commitment to integrity.

When he joined Paul Hastings LLP as a Senior Litigation Associate, Brown was positioned to leverage his litigation expertise, contribute to high-stakes matters, and advance into leadership. Instead, he encountered a culture resistant to equitable advancement, particularly for those who, like him, sit at the intersection of race and sexual orientation.

Opposite him stood Brad Bondi, Global Co-Chair of Investigations and White Collar Defense at Paul Hastings—a figure deeply embedded in the firm's power structure and connected to the upper echelons of conservative political networks, including President Donald Trump and Special Government Employee Elon Musk. Bondi's legal pedigree is matched only by his political entrenchment. His sister, Pam Bondi, is the former Attorney General of Florida and the current United States Attorney General. Within Paul Hastings, Bondi wielded influence not only over high-profile matters, but over the culture and direction of the litigation department itself. At the time these events unfolded, Bondi was also running for president-elect of the D.C. Bar, seeking to extend his reach and authority beyond the firm and into the leadership of the broader legal community.

This case is not simply about a breached agreement—it is about the collision between advocacy and entrenched power. Brown's requests for equitable treatment and advancement alignment challenged the status quo, and that challenge was met not with dialogue but with retaliation, isolation, and ultimately, a deliberate campaign to sideline him. When Brown sought to transition out of Paul Hastings, relying on a confidentiality agreement designed to protect him, the Firm and its leadership—steered by individuals like Bondi—breached that protection, sabotaging a career-defining opportunity and leaving Brown to face market stigma he was contractually barred from addressing.

## Work History

Cameron A. Brown graduated from Stanford Law School with multiple Honors. He earned his undergraduate degree in Economics, cum laude, from UC Davis, where he was elected to Phi Beta Kappa. Brown's career spans the nation's most competitive legal arenas—from prestigious BigLaw firms to a federal clerkship and a role at the U.S. Department of Justice—building a track record defined by litigation excellence, regulatory insight, and strategic advocacy.

Brown began his legal career at Paul, Weiss, Rifkind, Wharton & Garrison LLP, a firm renowned for its elite litigation practice and representation of Fortune 100 companies, financial institutions, and global corporations in high-stakes disputes. Brown's tenure at Paul, Weiss served as a launching pad for his litigation career, honing the advocacy, analytical rigor, and client service that would define his approach in subsequent roles.

Seeking to further sharpen his trial skills and expand his exposure to complex, high-profile litigation, Brown transitioned to Williams & Connolly LLP, following his federal clerkship with the Hon. Linda V. Parker in the U.S. District Court for the Eastern District of Michigan. At Williams & Connolly, one of the nation's most respected litigation boutiques, Brown thrived as a high-performing associate, gaining recognition for his trial work and contributing to the firm's reputation for excellence in courtroom advocacy.

Brown joined the U.S. Department of Justice, Consumer Protection Branch, where he prosecuted complex fraud cases, worked with federal agencies, and managed cross-agency investigations involving public health and safety. His role required rapid mastery of technical subject matter, including auditing processes, compliance systems, and regulatory frameworks, skills which he leveraged to lead expert interviews, conduct complex witness examinations, and resolve enforcement actions.

By the time Brown joined Paul Hastings LLP as an Associate in its Litigation and Investigations group, he had amassed a diverse portfolio of legal experience spanning BigLaw, government enforcement, and regulatory risk. At Paul Hastings, he was recruited to bolster the Firm's litigation team, contributing to high-profile litigation matters and internal investigations for major clients.

Brown's work consistently garnered praise from clients, partners and Firm leadership, including Brad Bondi, the Global Co-Chair of Investigations and White Collar Defense. His ability to operate under extreme time pressure, distill complex legal and regulatory issues into actionable strategy, and navigate the intersection of litigation and corporate risk marked him as a standout. Brown was not merely executing assignments; he was providing strategic value—advising on high-stakes matters with the precision and foresight expected of senior leadership. His performance positioned him as a natural candidate for advancement, including consideration for Of Counsel status.

Yet, when Brown sought promotion alignment and equitable treatment commensurate with his contributions, he was met not with opportunity but with stonewalling, isolation, and, ultimately, retaliation. The disconnect between his performance and the Firm's response revealed that the

barriers he faced were not about merit, but about power—a deliberate effort to marginalize him the moment he challenged the status quo.

## Protected Activity

While excelling in his role as an Associate at Paul Hastings LLP, Cameron A. Brown engaged in protected advocacy by raising concerns about the Firm's opaque promotion processes, particularly as they affected diverse attorneys. Drawing on both his track record of strong performance and the feedback he consistently received from leadership, Brown sought clarity on advancement opportunities—specifically, the path toward Of Counsel status, a recognition that would align his contributions and responsibilities with appropriate title and compensation.

Brown's advocacy extended beyond self-interest. He raised broader questions about the Firm's commitment to equity and the disparate treatment he observed in work allocation, mentorship access, and promotion alignment. In doing so, Brown challenged the Firm's entrenched power structures, including those overseen by Brad Bondi, Global Co-Chair of Investigations and White Collar Defense, whose leadership shaped the culture of the litigation department.

This advocacy constituted protected activity under the D.C. Human Rights Act, as well as common law retaliation doctrines, because it involved:

1. Raising concerns about equity and fairness in the workplace,
2. Requesting alignment between performance and promotion, and
3. Highlighting systemic barriers affecting diverse attorneys.

Rather than engage in dialogue or offer transparent feedback, Paul Hastings leadership retaliated. The response was not open discussion but a quiet escalation:

- Stonewalling promotion discussions,
- Diminishing Brown's access to key assignments, and
- Increasing scrutiny under the guise of policy compliance.

Brown's protected activity—a legitimate exercise of his rights to advocate for fair treatment—became the trigger point for the Firm's retaliatory campaign, culminating in isolation, constructive discharge, and the breach of confidentiality that derailed his career.

## Retaliation Timeline

Cameron A. Brown entered his role at Paul Hastings LLP as a high-performing senior associate, producing work of a caliber that beyond exceeded expectations. Between September and early November 2024, Brown received only positive feedback from Bondi, with no performance concerns raised.

The retaliation began the moment Brown advocated for equitable treatment and promotion alignment. On November 10–12, 2024, Brown formally raised concerns in writing to Neil Schumacher (Counsel) and Ronald Angus (Partner), highlighting workload disparities—

specifically, the unreasonable expectations placed upon him, compared to underperforming peers and junior associates. He pointed out that while four associates struggled for a week to produce an insufficient subpoena, Brown was being pressured to deliver high-stakes work within hours. He also approached Brad Bondi, rainmaking partner and Global Co-Chair of Investigations and White Collar Defense, directly advocating for a discussion around his role, responsibilities, and promotion to align with his contributions.

While Neil acknowledged the concerns, admitting associates were "shirking," no action was taken. Brad echoed that Brown's work was excellent and promised to "discuss"—but the conversation never came.

The retaliation escalated quickly. On November 13, 2024, during a high-profile client meeting, Bondi set Brown up for failure:

- Without notice, Brown was forced to recite legal research he had delivered a week earlier.
- He was pulled away from other assignments to conduct last-minute research for the meeting.
- Despite the client being impressed, Bondi harshly criticized Brown afterward—assigning him 24 additional hours of punitive research while placing him on competing assignments.

For the first time, Bondi publicly criticized Brown in front of another partner, Meredith, in their initial interaction—intensifying the professional isolation.

Between November 13–15, 2024, the retaliation solidified:

- Brown was given unreasonable research assignments clearly designed to waste his time.
- He was then frozen out of meaningful work for 30 days, receiving no direct assignments and forced to volunteer for scraps sent across case team emails to maintain his billable hours.

Simultaneously, Brown notified the Firm's career coach about the targeted criticism and isolation—but despite previously assuring Brown that certain issues "had to be escalated," the career coach took no action.

On December 9, 2024, after 30 days of isolation, Brown reached out to Kwame Manley, Global Chair of Litigation, voicing that he felt he had "fallen out of grace" with Bondi and needed to defend his every action. Shortly after that conversation, a pretextual complaint surfaced—claiming Brown failed to adequately review other associates' work—a criticism that had never been raised before. Rather than investigate, Kwame relayed criticisms from Bondi, Angus, and Schumacher and forced Brown back under their supervision, disguised as working with Angus alone. Kwame admitted that leaving at that point would create "the appearance of a work-related issue," leaving Brown trapped.

As Brown refused to resign quietly, the Firm engineered conditions designed to force an error between December 2024 and January 2025—laying the groundwork for his removal. During this period, Brown was overloaded with conflicting, high-stakes assignments, including multiple motions, a complaint, and a first-chair deposition, relying largely on a single unbarred law clerk, brand new to legal practice. Simultaneously, he handled pro bono litigation requiring multiple 4-8 hour meet-and-confers. The Firm's strategy was clear: overwhelm Brown, isolate him, and leave him to navigate the minefield alone, while others avoided accountability.

The culmination of this campaign centered on Neil Schumacher, Of Counsel, acting under the direction and protection of Brad Bondi. Prior to drafting a key motion, Brown conducted comprehensive legal research on Westlaw, independently reviewing and downloading all relevant cases. However, Schumacher, in the eleventh hour, revised the draft to center a specific case, which was later identified as containing erroneous facts. Knowing Brown was under extreme pressure and juggling multiple priorities, Schumacher instructed Brown to expand on this case, likely aware that Brown would refer back to earlier research notes—which, unbeknownst to Brown, contained an inaccurate AI-generated summary from a post-research workflow.

Schumacher's timing was no accident. He strategically assigned the task at the last minute, ensuring that junior associates with limited experience would review the motion while Brown focused on other urgent matters. Despite the motion passing through multiple partner and associate reviews, including Schumacher, Bondi, Ronald Angus, and others, the error was never corrected. Brown's name was not on the filing, nor was he the final reviewer. In fact, by the time of submission, Brown had been explicitly directed to focus 100% of his time on a separate matter.

When opposing counsel identified the error in their response brief, Schumacher forwarded it to Brown with a curt instruction to "review their arguments", offering no acknowledgment of the oversight. Once Brown identified the error and informed Angus and Schumacher, Schumacher never responded and ceased all communication with Brown. Brown was scapegoated for a collective failure, engineered under Bondi and Schumacher's supervision.

This deliberate orchestration of failure—designed to create the appearance of misconduct—was an intentional retaliatory act. The Firm then selectively enforced its AI policy as a pretext for Brown's removal, leveraging an innocuous citation error as a justification for his expulsion. This manipulation of process and policy illustrates the depth of the Firm's retaliatory scheme—targeting Brown after months of isolation, overwork, and fabricated performance critiques designed to force him out.

### Breach of Confidentiality

The final act of retaliation came after Paul Hastings LLP placed Cameron A. Brown on paid leave under pretextual grounds, but it extended beyond the Firm's walls—ensuring that Brown's career transition would collapse before it could even begin.

On January 29, 2025, Brown was placed on paid leave by Paul Hastings, confirmed in an email from Adele Maloney, the Firm's General Counsel. Although the Firm avoided labeling it

"administrative leave", the practical reality was identical: Brown's Firm access was terminated, his client work reassigned, and his professional standing within the Firm erased.

Under Section 6(d) of the Confidential Transition Agreement and General Release executed on March 27, 2025, Paul Hastings was bound to strict confidentiality regarding Brown's employment status and departure terms. This provision was designed to protect Brown's reputation in the legal market—the only shield against the stigma of retaliation and constructive discharge.

That shield was shattered.

In April 2025, Brown advanced to the final stages of candidacy for a Senior Counsel, Litigation & Commercial role at AlphaSense, Inc., a leading AI-driven market intelligence firm. This was a career-defining opportunity:

- $200,000+ base salary,
- Performance bonuses,
- $100,000+ in pre-IPO equity, with significant post-IPO upside, and
- A clear path to executive leadership.

After receiving strong feedback from every interviewer, Brown was contacted by Herbert Wang, Vice President of Legal at AlphaSense, who confirmed that references were universally positive. However, Wang informed Brown that AlphaSense could not proceed—citing reliable information that Brown was on "administrative leave" from Paul Hastings.

This confidential employment status—known only within Paul Hastings—was the sole reason AlphaSense rejected Brown. Wang even invited Brown to explain the circumstances, an offer that forced Brown to deny the assertion while bound by the confidentiality agreement. Brown, adhering to his obligations, affirmed his active employment and directed Wang to Adele Maloney and Kwame Manley for verification. Despite this, Paul Hastings remained silent.

This breach was not speculative. The specificity of the disclosed status—paid leave/administrative leave—could only have originated from Paul Hastings or its agents. A mere passerby or peripheral staff member or employee, even one observing Brown's furnished, decorated, unoccupied office, would lack both the context and authority to glean these precise employment details, let alone allow such information to "float in the ether" and somehow reach the Vice President of Legal at AlphaSense, a fully remote company headquartered in New York, with no legal staff stationed in Washington, D.C. Wang's admission that he was informed by a "reliable source" reinforces that this information flowed directly or indirectly from the Firm. His further acknowledgment that the negative inference derived from this confidential information was the sole factor driving the rejection eliminates any doubt as to causation.

By leaking confidential information, Paul Hastings violated the core protection of the Transition Agreement, extinguishing Brown's AlphaSense opportunity and crippling his professional standing. Bound by confidentiality, Brown could not even defend himself—left unable to counter the narrative or explain the circumstances to prospective employers.

This breach destroyed a $2.5 million+ opportunity, including base compensation, equity upside, and executive leadership prospects. But more profoundly, it eviscerated Brown's ability to transition—the very purpose of the confidentiality agreement. Paul Hastings' silence, in the face of the damage they caused, only compounded the harm, ensuring that Brown's career path would remain obstructed long after the breach.

## **Affirmative Defenses: Equitable, Contractual and Public Policy Grounds**

Brown raises the following affirmative defenses in response to any anticipated claims by Paul Hastings LLP—whether they assert that filing this arbitration demand or seeking modification of confidentiality constitutes a breach of contract, or otherwise seek to challenge Brown's right to assert his claims.

### **1. Prior Material Breach (Waiver and Estoppel)**

Paul Hastings LLP materially breached the Transition Agreement first—specifically, by disclosing Brown's employment status and circumstances surrounding his departure. These disclosures directly violated Section 6(d) of the Transition Agreement, the very provision designed to protect Brown during his career transition. This breach is not speculative. The specificity of the disclosed information—that Brown was on paid leave/administrative leave—could only have originated from Paul Hastings or its agents. This information was provided to AlphaSense, Inc., resulting in Brown's loss of future employment.

By breaching the core confidentiality obligation, Paul Hastings waived its right to enforce that term against Brown. Under longstanding principles of contract law, a party in material breach cannot demand performance on the terms it has already violated. Paul Hastings' breach thus bars any effort to invoke confidentiality provisions as a defense, or to claim that Brown's assertion of his rights constitutes a violation. The Firm is further equitably estopped from asserting confidentiality, as it benefitted from its breach while leaving Brown to bear the consequences.

### **2. Truthful Statements in Legal Proceedings (Contractual Carve-Out)**

Even apart from Paul Hastings' breach, Section 3 of the Transition Agreement explicitly permits truthful statements in legal proceedings. Brown's filing of this arbitration demand, his motion to modify confidentiality, and any related disclosures to JAMS or other legal bodies fall squarely within this carve-out. Any effort by Paul Hastings to argue that these filings breach confidentiality contradicts the agreement's own terms. Brown remains within the protected scope of permissible conduct under the Transition Agreement.

### **3. Unconscionability (Procedural and Substantive)**

Enforcing confidentiality strictly against Brown under these circumstances would be unconscionable. The Transition Agreement was structured with severe asymmetry: any breach by Brown voids his severance, benefits, and rights, yet no parallel accountability applies to Paul Hastings. Even after breaching its own confidentiality obligations, Paul Hastings retains the

19

benefits of the agreement—including protection of its reputation in perpetuity—while Brown bears all the harm. This imbalance of remedies is fundamentally unjust.

Confidentiality was never intended to shield a party's misconduct. To enforce it now would allow Paul Hastings to leverage its breach into perpetual silence for Brown, preventing him from defending his professional reputation or securing future employment. Arbitration, as a system rooted in equity, cannot facilitate such coercive imbalances.

### 4. Public Policy and Ethical Oversight

This dispute implicates broader concerns of public trust and ethical accountability within the legal profession. Brad Bondi, the central figure in these allegations, is actively campaigning for President-Elect of the D.C. Bar, seeking to influence the disciplinary processes and ethical standards governing attorneys in the District of Columbia. Allegations concerning retaliation, career sabotage, and abuse of confidentiality go directly to Bondi's fitness for leadership.

Shielding these proceedings under absolute confidentiality would obstruct the legal community's ability to assess these claims. Public policy demands transparency when those who seek positions of influence over attorney discipline are implicated in conduct that undermines the ethical obligations of the profession. Enforcing confidentiality to suppress these claims offends the public interest and violates the spirit of legal ethics.

### 5. Failure to Mitigate Harm

Following its breach, Paul Hastings failed to take reasonable steps to mitigate the harm inflicted on Brown. After being notified of the disclosure to AlphaSense, the Firm made no attempt to correct the record, clarify Brown's status, or prevent further reputational harm. This inaction exacerbated Brown's damages and further justifies the limited relief sought here.

### Damages & Relief Requested

Paul Hastings LLP's conduct—including their material breach of the Confidential Transition Agreement—has caused severe, quantifiable harm to Cameron A. Brown, warranting full compensatory, reputational, emotional, and punitive damages, as well as declaratory relief.

1. **Lost Compensation and Equity (AlphaSense Opportunity)**:

   The rejection from AlphaSense, Inc., driven solely by Paul Hastings' breach, resulted in the loss of:

   - Base salary: $200,000+,
   - Performance bonuses: $25,000–$40,000,
   - Pre-IPO equity: $100,000+, with post-IPO upside,
   - Remote premium flexibility.

Total immediate compensation loss: $375,000–$405,000 in year one.

Factoring in long-term career trajectory—including anticipated equity appreciation and promotion—this amounts to $2.5 million in lost compensation and equity.

2. **Future Career Losses**:

The destruction of Brown's executive track has broader implications for his earning capacity. The AlphaSense role was not only lucrative—it was designed to springboard Brown to executive leadership, positioning him for $400,000–$500,000 annual compensation packages in the future.

Estimated future earning loss: $2.5 million over 5–10 years.

3. **Reputational Harm and Emotional Distress**:

Paul Hastings' breach placed Brown in an untenable professional position—silenced under confidentiality while his career was actively undermined. The market stigma caused by the Firm's breach, combined with the emotional distress of retaliation, isolation, and career derailment, entitles Brown to $5 million in non-economic damages.

4. **Punitive Damages**:

Paul Hastings' actions were willful—engineered to destroy Brown's career while holding him bound to confidentiality. The Firm weaponized the Transition Agreement as both shield and sword, violating its terms while preventing Brown from defending himself.

To punish this egregious conduct and deter similar future misconduct, Brown seeks no less than $5 million in punitive damages.

5. **Legal Fees and Costs**:

Under Section 9(c) of the Transition Agreement, and consistent with JAMS Employment Arbitration Rules, Brown seeks full reimbursement of legal fees and arbitration costs.

6. **Declaratory Relief**:

Brown seeks a formal declaration that Paul Hastings materially breached the Transition Agreement, thereby voiding all restrictive covenants, including non-disparagement and confidentiality provisions, which the Firm continues to invoke unjustly.

In light of the severity of Paul Hastings' misconduct, the lasting economic, reputational, and emotional harm inflicted, and the need to deter future violations, Brown respectfully requests an award of no less than $15 million in total damages, including compensatory, non-economic, and punitive damages, along with declaratory relief and legal fees, ensuring that Paul Hastings is fully accountable for its retaliation, breach, and deliberate destruction of Brown's career trajectory.

## Venue and Rules

This arbitration is filed pursuant to Section 9(a) of the Confidential Transition Agreement and General Release, executed on March 27, 2025, which requires that any disputes arising out of or related to the Agreement be submitted to binding arbitration under the JAMS Employment Arbitration Rules and Procedures.

- The arbitration shall be seated in Washington, D.C., as stipulated in the Agreement.
- The arbitration shall be governed by the Federal Arbitration Act (FAA).
- The JAMS Employment Arbitration Rules, as in effect at the time of filing, shall govern the proceedings.

Brown does not consent to any confidentiality restrictions regarding the contents of this Demand for Arbitration or any related filings. Brown reserves the right to disclose or discuss the contents of this proceeding publicly, unless explicitly ordered otherwise by the Arbitrator pursuant to JAMS Employment Arbitration Rule 26.

Brown further reserves all rights to recover legal fees, costs, and any additional relief available under the Agreement and applicable law.

Respectfully submitted,

**Cameron A. Brown, Esq.**
1625 Eckington PL NE, PH104
Washington, D.C. 20002
cabrwn@gmail.com
(909) 833-5169

Monday, April 28, 2025

EXHIBIT A

## CONFIDENTIAL TRANSITION AGREEMENT AND GENERAL RELEASE

The undersigned employee, Cameron A. Brown ("you" or "your"), and Paul Hastings LLP (the "Firm") are entering into this Confidential Transition Agreement and General Release (this "Agreement") to end amicably their relationship.  The Firm and you agree as follows:

1.  **Resignation**:  You acknowledge that your employment with the Firm will terminate on the earliest of: (i) May 6, 2025; (ii) the date immediately preceding the start of any other employment or legal position; or (iii) the date you resign (hereinafter, the "Separation Date"), subject to the last sentence of this section 1.  Your departure is and will be classified as a resignation.  Your last day of active work was January 29, 2025, after which you were placed on paid administrative leave.  As of the date of this agreement, you will be considered an inactive employee.  The Firm reserves the right to accelerate the Separation Date for any reason, including but not limited to if it suspects you are not complying with this Agreement.  On the Separation date, the Firm agrees that it will promptly return to you any personal belongings or personal items currently located within your office or otherwise in the Firm's possession, custody, or control, including but not limited to personal files, photographs, decorations, books, electronic devices, or other personal effects.

2.  **Payments and Benefits**:

    (a)    The Firm will continue to pay you at your current base salary level (less applicable payroll withholdings and deductions), on the regular payroll schedule, through the Separation Date.  In the event that you accept any other employment or any legal position (including contract work) prior to May 6, 2025, you must notify the Firm within 24 hours of accepting such other employment or legal position and of the mutually agreed-upon start date of such employment or legal position.

    (b)    The Firm also agrees to waive any right to seek reimbursement of any signing or other bonus you have been paid, notwithstanding the pro-rata bonus reimbursement provision of your employment offer dated September 11, 2024.

    (c)    The Firm does not intend to contest your application for unemployment benefits.  Your eligibility to receive unemployment benefits is determined by a local agency, and the Firm will respond truthfully to requests for information it receives from that agency.

    (d)    You will have listen-only access to your Firm voice mailbox and your profile will remain on the Firm website through the Separation Date; provided, however, that the Firm's failure to provide this benefit will not be considered a breach of this Agreement.  Your access will cease upon the abuse of any of these privileges or your violation of any term of this Agreement, should any occur (as determined in the Firm's sole discretion) prior to the Separation Date.

    (e)    You understand that all health insurance benefits, life insurance benefits, Firm disability benefits, and contributions to the Firm retirement plans will end as of the Separation Date .  Your Firm health insurance benefits, if any, will remain in effect

Employee Initials: _CB_
PH Initials: _____

through March 31, 2025. Health insurance benefits, if any, will continue thereafter to the extent that you are eligible under COBRA and timely and properly elect COBRA coverage. As an additional benefit, if you are eligible under COBRA and timely and properly elect COBRA coverage, the Firm will contribute to the cost of continued coverage under COBRA through May 31, 2025 (at your preexisting coverage level), provided you continue to pay the then-current employee share of the premium for the coverage. If you choose to enroll in COBRA, you must remit your COBRA premium directly to WEX Benefits, the Firm's COBRA administrator. Your premiums will no longer be deducted from your pay.

(f)     You acknowledge that you are not entitled to any other compensation, bonus, severance pay, vacation accrual, vacation pay, expense reimbursement, or other payment or benefits of any kind beyond what the Firm has already paid or provided to you, except that you retain your vested benefits, if any, earned during the period of your active employment under all Firm qualified retirement plans, as determined under the official terms of those plans.

(g)     You acknowledge that you only will be entitled to the salary continuation, and any other benefits promised by this Agreement, if you timely sign this Agreement.

3.     **Mutual Non-Disparagement**: You agree that neither you nor anyone acting on your behalf has made in the past, is making now, or will make in future any derogatory or disparaging statement about the Firm, the Firm's partners (including, but not limited to, Kwame Manley, Brad Bondi, Ronald Anguas, and Adele Maloney), the Firm's associates, employees or agents, or the Firm's clients; or statements accusing the Firm or any of its partners, associates, employees, or agents of any misconduct or unlawful behavior or that brings the Firm or any of its partners, associates, employees, or agents into disrepute, or tarnish any of their images or reputations. Kwame Manley, Brad Bondi, Ronald Anguas and Adele Maloney agree not to make any derogatory or disparaging statement about you. For purposes of this section, a disparaging statement is any communication, oral or written, which would tend to cause the recipient of the communication to question the business condition, integrity, competence, fairness, or good character of the person to whom or entity to which the communication relates.

The provisions of this section shall not apply to truthful testimony as a witness, compliance with other legal obligations, assertion of or defense against any claim of breach of this Agreement, or any activity that otherwise may be required or permitted by the lawful order of a court or agency of competent jurisdiction, and shall not require you or the Firm to make false statements or disclosures. The provisions of this section also shall not apply to the Firm (i) with respect to any statements or responses made in connection with actual or potential litigation, inquiries or claims by Firm clients, inquiries by any court of competent jurisdiction, or the Firm's exercise of its professional obligations; or (ii) in the event of your breach of this Agreement. The provisions of this section also shall not apply to you with respect to any inquiries by any court of competent jurisdiction. So that there is no misunderstanding, it is understood and agreed that any obligation by Kwame Manley, Brad Bondi, Ronald Anguas, and Adele Maloney not to make derogatory or disparaging statements about you will be voided completely and forever in the event you

2          Employee Initials: _CB_

PH Initials: ____

DocuSign Envelope ID: 3605E05D-DEA5-4719-95B6-8B508823BA6E    Case 1:25-cv-05491    Document 1-1    Filed 07/02/25    Page 52 of 73

breach your obligations under this section or any other section of this Agreement. It is further understood and agreed that other than as provided in this section, nothing in this Agreement limits the Firm's ability to respond to any inquiries it may receive from media, clients, courts, litigation counterparties, or professional associations.

4.  **Complete Release**: You release and waive (i.e., give up) all known and unknown claims that you presently have against the Firm; its current or former partners, owners, employees, parents, subsidiaries, and affiliates; the current and former partners, owners, employees, officers, directors, representatives, agents, insurers, benefit programs (and the administrators and insurers of such programs) thereof; and any related parties (collectively, the "Released Parties"), except for claims that this Agreement expressly states that you do not release and waive. The claims you are releasing include all claims, promises, debts, causes of action or similar rights of any type or nature you have or had, which in any way relate to your employment with the Firm or the cessation of that employment. For example, you are releasing all common law contract, tort, or other claims you might have, as well as all claims you might have for employment discrimination under laws including, without limitation and each as amended, Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, the Equal Pay Act of 1963, sections 1981 and 1983 of the Civil Rights Act of 1866, the Americans with Disabilities Act ("ADA"), the Pregnancy Discrimination Act ("PDA"), the Pregnant Worker's Fairness Act ("PWFA"), and the Genetic Discrimination Act ("GINA"); any claims under any other applicable employment-related laws such as the Worker Adjustment and Retraining Notification Act ("WARN"), the Employee Retirement Income Security Act of 1974 ("ERISA"), the Occupational Safety and Health Act ("OSHA"), the Family Medical Leave Act ("FMLA"), and the Fair Credit Reporting Act ("FCRA"); and any claims under applicable similar state, District of Columbia, or local laws, such as the District of Columbia Human Rights Act, the District of Columbia Family and Medical Leave Act, the District of Columbia Accrued Sick and Safe Leave Act, and the District of Columbia Earned Sick and Safe Leave Amendment Act. You understand and agree that this release extends to both claims you are aware of and claims you are not aware of. You expressly waive all rights afforded by laws regarding a waiver of unknown claims. The only claims you do not release are: (i) claims that the law does not permit you to waive by signing this Agreement, such as claims for your vested benefits, if any, earned during the period of your active employment under the Firm's qualified retirement plans, as determined under the official terms of those plans; and (ii) your right to enforce this Agreement.

5.  **Contingent Agreement Not to Sue**: Provided that you remain in compliance with the terms of this Agreement, including but not limited to sections 3 and 6(a), the Firm will not pursue any claims, causes of action, or similar rights of that it presently has against you. This provision is without prejudice to (i) claims or causes of action not presently known to the Firm, or (ii) the Firm's right to enforce this Agreement. So that there is no misunderstanding, it is understood and agreed that any obligation by the Firm not to pursue presently known claims or causes of action against you will be voided completely and forever in the event you breach your obligations under this Agreement.

6.  **Your Promises**: In addition to the releases of claims provided for in section 3, above, you acknowledge and agree that:

3    Employee Initials:

PH Initials:



(a)    You will cooperate with the Firm and continue to follow the Firm's instructions in a diligent and professional manner through the Separation Date, including providing information requested by the Firm. You will not perform legal services for any person or entity prior to the Separation Date, unless authorized by the Firm to do so in your capacity as an associate of the Firm. You will be responsive to and cooperate in full with Firm requests for information both before and after the Separation Date, including with respect to any compliant, claim, or inquiry relating to your work for Firm clients.

(b)    On or before the date you signed this Agreement, you have returned or will return to the Firm all Firm files, memoranda, documents, records, copies of the foregoing, laptops, mobile and smart phones, flash drives, credit cards, all Firm-related information, building and security passes, identification cards, keys, books, and any other Firm property in your possession or control (including but not limited to information on your home computer).

(c)    By no later than March 7, 2025, you will reimburse the Firm for any amounts owed by you to the Firm, if any. In the event you do not do so, you authorize the Firm to deduct any amounts owed to the Firm from the payments provided for in section 2 of this Agreement in accordance with applicable law.

(d)    You will not disclose (and by signing this Agreement you represent that you have not disclosed) the facts or circumstances leading to your departure from the Firm or the fact or terms of this Agreement, including but not limited to, the fact or amount of the payment to be paid to you under this Agreement, to anyone other than a member of your immediate family, your attorney, your therapist, mental health professional, or other professional advisor to you; and, even as to such a person, only if the person agrees to honor this confidentiality requirement. (The Firm is aware of your discussions with the Firm's General Counsel.) This promise specifically prohibits, but is not limited to, disclosures to any past or present employee or partner of the Firm, any representative of the media, and/or any social media forum. Nothing in this Agreement generally, nor this section specifically, should be interpreted as prohibiting your disclosure of the amount to the extent necessary legally to enforce this Agreement, nor does it prohibit disclosures to the extent otherwise legally required or as requested by any governmental agency. Nothing in this Agreement limits your rights under section 7 of the National Labor Relations Act or your ability to communicate with any government agency to the extent you are entitled as a matter of law to engage in such communications.

(e)    Your position as an associate in the Washington, D.C., office provided you with access to the Released Parties' confidential and proprietary information, including legal strategies, attorney work product, attorney-client communications and information, financial and business strategies, and financial information related to the Released Parties that has not been made public ("Confidential Business Information"). You will not disclose any Confidential Business Information before it is made public, if ever, to anyone unless legally required pursuant to a subpoena or court or government agency order; and, in such event, only after you have, where

4                      Employee Initials: _CB_

PH Initials: _____

reasonably possible, provided the Firm's General Counsel with at least five business days' notice of a disclosure obligation or request. You will cooperate with the Firm in taking all steps the Firm deems to be appropriate regarding the required disclosure of any of the Confidential Business Information.

(f)     You will not disparage or comment negatively about the Firm's legal services provided to its clients, and you represent you have not done so since receiving this Agreement.

(g)     When you decided to sign this Agreement, you were not relying on any representations that were not in this Agreement.

(h)     You have not been told that the Firm or any Released Party ever will employ you in the future. You promise not to seek employment with the Firm or any then-current partner or employee unless they personally ask you to do so. Nothing in this provision shall prevent you from seeking employment with any individual who, subsequent to your Separation Date, is no longer employed by or affiliated with the Firm.

(i)     If you initially did not think any representation you are making in this *Agreement* was true or if you initially were uncomfortable making it, you resolved all your doubts and concerns before signing this Agreement. You have carefully read this Agreement, you acknowledge that you had sufficient time to review it before signing, and you fully understand what it means. You are entering into it knowingly and voluntarily, and all your representations in it are true. The Firm would not have entered into this Agreement but for the representations and promises you are making in it.

(j)     You have not suffered any job-related wrongs or injuries, such as discrimination, for which you might still be entitled to compensation or relief in the future. You have properly reported all hours that you have worked, and you have been paid all wages, overtime, commissions, compensation, benefits, and other amounts that the Firm or any Released Party should have paid you in the past.

(k)     You have not assigned or given away any of the claims you are releasing.

(l)     You are less than forty years of age at the time you sign this Agreement.

7.     **Communications with Government Entities**:  Nothing in this Agreement prevents you from previously or in the future giving truthful testimony or truthfully responding to a valid subpoena, or communicating with, responding to questions from, filing a charge with, or testifying or otherwise participating in a proceeding before a government or regulatory entity (such as the U.S. Equal Employment Opportunity Commission, National Labor Relations Board, U.S. Department of Labor or any similar state, district, or local organization), subject to any obligation you have to take steps to protect confidential information from public disclosure. However, you understand that other than your right to receive and retain a monetary award from a government-administered whistleblower award program, you will

Employee Initials:
PH Initials:

Case 1:25-cv-05491 Document 1-1 Filed 07/02/25 Page 55 of 73

not be entitled to recover damages or other relief in any government agency proceeding as to any claim released in this Agreement. You further understand that you do not need to provide advance notice to the Firm before engaging in any of the activity described in this section.

8. **Defend Trade Secrets Act**: Notwithstanding your confidentiality obligations set forth in this Agreement and your continuing obligation to maintain the confidences and privileges of Firm clients pursuant to the Firm's confidentiality requirements, you understand that, pursuant to the Defend Trade Secrets Act of 2016, you will not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that: (a) is made (i) in confidence to a federal, state, District of Columbia, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. You understand that in the event it is determined that disclosure of the Firm's trade secrets was not done in good faith pursuant to the above, you may be subject to substantial damages, including punitive damages and attorneys' fees.

9. **Other Terms and Conditions.**

(a)     You and the Firm agree to resolve any claims either may have against each other on an individual basis through final and binding arbitration. Such arbitration will be administered by JAMS pursuant to its Employment and Arbitration Rules and Procedures. You also agree to resolve in accordance with this subsection any claim between you and any of the other Released Parties who offers or agrees to arbitrate the claim in this manner. This arbitration requirement applies to, among other things, disputes about the validity, interpretation, or effect of this Agreement or alleged violation of it, claims for defamation, claims of discrimination or retaliation under federal, state or local law, or other statutory violation claims. For the avoidance of doubt, this Agreement is governed by the Federal Arbitration Act ("FAA") and does not extend to claims that as a matter of law, after application of FAA preemption principles, cannot be made subject to an arbitration agreement. Arbitrations will be conducted by JAMS in accordance with its employment dispute resolution rules (and no other JAMS rules), except that if any provision of this section conflicts with the JAMS rules, then the provision of this section will prevail. This agreement to arbitrate does not preclude resort to or recovery through any government agency process or proceeding, including but not limited to those of the National Labor Relations Board and the Equal Employment Opportunity Commission (or its state and local counterparts). The Firm will be responsible for paying any filing fee and the fees and costs of the Arbitrator; provided, however, that if you are the party initiating the claim, then to the maximum extent permitted by law, you will contribute an amount equal to the filing fee to initiate a claim in the court of general jurisdiction in the state or district in which you were last employed by the Firm. Each party will pay in the first instance its own litigation costs and attorneys' fees, if any. To the maximum extent permitted by law, the arbitrator will award the prevailing party its costs and reasonable attorney's fees; provided, however, that the arbitrator will rule upon a motion for attorneys' fees and/or

6

Employee Initials: _CB_

PH Initials: _[signature]_

DocuSign Envelope ID: 3C0789D9-DF35-47A4-BFEF-4FD9882M

litigation costs under the same standards a court would apply under the law applicable to the claim(s) at issue. You understand that by signing this Agreement, you are giving up your right to a jury or court trial and your right to participate in a class, collective or representative action.

(b)     This Agreement is the entire agreement relating to the resignation of your employment with the Firm, and any claims or future rights that you might have with respect to the Firm and the Released Parties. This Agreement supersedes all prior agreements between you and the Firm and all prior representations made to you by the Firm, except that this Agreement does not supersede (i) your Mutual Agreement to Arbitrate Claims dated September 11, 2024 (the "Prior Arbitration Agreement"), which is incorporated herein by reference; and (ii) your obligations under any employment policies, including but not limited to the Firm's Professional Conduct Policy, that apply to the Firm's employees. The Prior Arbitration Agreement shall control over the arbitration promise contained in the prior subsection, provided, however, if for any reason the Prior Arbitration Agreement is held unenforceable, then the arbitration promise contained in this Agreement shall apply.

(c)     This Agreement is not an admission of wrongdoing by the Firm, you or any other Released Party.

(d)     This Agreement shall be construed as a whole according to its fair meaning, and not strictly for or against any party.

(e)     This Agreement only may be amended by a written agreement that the Firm and you sign.

(f)     If the Firm or you successfully assert that any provision in this Agreement is void, the rest of the Agreement shall remain valid and enforceable unless the other party to this Agreement elects to cancel it. If this Agreement is voided, you will repay any payments or benefits you previously received for signing it.

(g)     This Agreement shall bind and inure to the benefit of your heirs, administrators, representatives, executors, successors and assigns, and shall inure to the benefit of all Released Parties and their respective heirs, administrators, representatives, executors, successors and assigns.

(h)     This Agreement shall be governed by federal law and the laws of the District of Columbia.

(i)     You are hereby advised to consult with an attorney before signing this Agreement. You acknowledge that you have had sufficient time to review this Agreement thoroughly and that you have discussed all aspects of this Agreement with an attorney of your choice to the extent you wished to do so.

(j)     This Agreement may be signed in one or more counterparts or multiple originals, each of which shall be an original but all of which together shall constitute one and

7

Employee Initials: _____

PH Initials: _____

Case 1:25-cv-05491   Document 1-1   Filed 07/02/25   Page 57 of 73

the same document. The parties agree that facsimile and electronic signatures have the same force and effect as original signatures.

(k)    This Agreement will become effective upon your return of a signed copy of the Agreement to the Firm.

PLEASE READ THIS AGREEMENT CAREFULLY. IT CONTAINS A RELEASE OF ALL KNOWN AND UNKNOWN CLAIMS.

Executed on   3/27/2025  _____

*Cameron Brown*
AA6118C5E7804A3...
Cameron A. Brown

Executed on   3/27/2025  _____

Paul Hastings LLP

By: _____
24A9659A0AB24C1...
Adele P. Maloney
General Counsel

8

Employee Initials: \_\_\_\_
PH Initials: \_\_\_\_

EXHIBIT C

FILED: NEW YORK COUNTY CLERK 06/30/2025 04:50 PM
NYSCEF DOC. NO. 4

INDEX NO. 158336/2025
RECEIVED NYSCEF: 06/30/2025

Case 1:25-cv-05491    Document 1-1    Filed 07/02/25    Page 59 of 73

Filed 2025
6/16 2025 5:24:24 PM
Superior Court
of the District of Columbia

IN THE SUPERIOR COURT OF THE DISCTRICT OF COLUMBIA
CIVIL DIVISION

JURISDICTION: D.C. CODE § 11-921

**CAMERON ANGEL BROWN,**
1625 ECKINGTON PL NE
PH104
WASHINGTON, DC 20002,

Case No.:

            Plaintiff,

**COMPLAINT**

**JURY TRIAL DEMANDED**

vs.

**FREDERICK D. COOKE, JR.,** AND
**RUBIN, WINSTON, DIERCKS, HARRIS &
COOKE LLP,**
1250 CONNECTICUT AVENUE NW
SUITE 700
WASHINGTON, D.C. 20036,

            Defendants.

## INTRODUCTION

This is an action for legal malpractice, breach of fiduciary duty, and negligent

representation arising from Defendant Frederick D. Cooke, Jr.'s failure to competently,

diligently, and loyally represent Plaintiff Cameron A. Brown in a high-stakes employment

dispute involving Plaintiff's abrupt expulsion from a prestigious national law firm. On January

29, 2025—the same day Plaintiff was placed on administrative leave without prior notice—

Defendant agreed to serve as legal counsel and, on Plaintiff's behalf, communicated directly with

opposing counsel Adele Maloney, General Counsel, and Kwame Manley, Global Chair of

Litigation, at Paul Hasting LLP in Washington, D.C.

Despite this clear undertaking of representation, Defendant failed to provide any written

engagement agreement, failed to disclose any conflicts of interest, and failed to discuss the

COMPLAINT JURY TRIAL DEMANDED - 1

scope, risks, or strategy of the representation. Defendant then facilitated a one-sided separation agreement without adequately advising Plaintiff of its legal implications, and subsequently withdrew representation without explanation after receiving a multiple drafts and service of the an arbitration demand against Paul Hastings LLP and five of its senior attorneys.

Defendant's conduct has materially damaged Plaintiff's legal position in a pending arbitration involving multimillion-dollar claims, caused reputational and economic harm, and prompted a preliminary ethics inquiry by the D.C. Office of Disciplinary Counsel.

## JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this action pursuant to D.C. Code § 11-921, which vests the Superior Court of the District of Columbia with original jurisdiction over all civil matters.

Venue is proper in this Court under Superior Court Rule of Civil Procedure 3, as all relevant acts, omissions, and injuries giving rise to this claim occurred within the District of Columbia. Defendant resides and practices law in the District, and the representation at issue was undertaken and terminated within the District.

## INCORPORATION BY REFERENCE

Plaintiff incorporates by reference the facts, allegations, and exhibits contained in the following documents, each of which is either appended hereto or already in Defendant's possession:

1. **Arbitration Demand** filed with JAMS on April 28, 2025 (attached hereto as Exhibit A), which was transmitted to Defendant Cooke on or before the date of his withdrawal from representation;

COMPLAINT JURY TRIAL DEMANDED - 2

2. **Text message from Kwame Manley, Global Litigation Chair at Paul Hastings LLP** (attached hereto as Exhibit B), which discouraged Plaintiff from seeking legal counsel and constitutes direct evidence of coercive conduct known to Defendant during the course of his representation and prior to execution of the Transition Agreement;

3. **Confidential Transition Agreement and General Release** (attached hereto as Exhibit C), which Defendant reviewed and engaged with during the course of his representation and which forms the factual and legal basis for multiple claims in the pending arbitration;

4. **Email from Plaintiff to Adele Maloney and Kwame Manley** (attached hereto as Exhibit D), which placed Paul Hastings LLP on formal notice of reputational, procedural, and confidentiality-related harm, and which was contemporaneously shared with Defendant, further underscoring his failure to act on critical risk indicators during the representation period.

5. **AlphaSense Email Exchange** (attached hereto as Exhibit E), which Plaintiff communicated to Defendant as real-time evidence of reputational and professional harm caused by the breach of confidentiality Defendant failed to address or investigate;

6. **Plaintiff's Sworn Declaration with Supporting Motions and Case Law** (attached hereto as Exhibit F), which detail the procedural and substantive damage resulting from Defendant's lack of diligence, absence of strategic engagement, and failure to clarify or protect Plaintiff's rights prior to the execution of the transition agreement;

COMPLAINT JURY TRIAL DEMANDED - 3

7. **Notice of Preliminary Inquiry from the D.C. Office of Disciplinary Counsel, Inquiry No. 2025-U891** (attached hereto as Exhibit G), which confirms that Defendant's conduct is now the subject of an active ethics investigation.

Plaintiff reserves the right to supplement this record upon further discovery. Each document referenced herein is incorporated in full as though restated in its entirety and serves to amplify and support the allegations set forth in this Complaint.

## STATEMENT OF FACTS

1. **Representation Begins (January 29, 2025):**

On January 29, 2025—the same day Plaintiff was placed on administrative leave by his employer, Paul Hastings LLP—Defendant Frederick D. Cooke, Jr. agreed to represent Plaintiff in connection with anticipated employment-related legal matters. Defendant provided legal advice and initiated communications with opposing counsel on Plaintiff's behalf. At no point did Defendant provide an engagement letter, disclose any potential conflicts of interest, or offer a written fee agreement.

2. **Scope and Nature of Representation:**

Defendant's role included direct communication with Adele Maloney, General Counsel of Paul Hastings LLP, in which he represented himself as Plaintiff's attorney. Defendant reviewed and discussed with Plaintiff a proposed "Confidential Transition Agreement and General Release" and ultimately advised Plaintiff to sign the agreement. Defendant failed to address or investigate whether the proposed agreement was retaliatory, procedurally coercive, or contained terms materially disadvantageous to Plaintiff's legal position.

3. **Unilateral Withdrawal (April 28, 2025):**

COMPLAINT JURY TRIAL DEMANDED - 4

On April 28, 2025, after receiving a copy of Plaintiff's filed arbitration demand outlining claims of retaliation, reputational harm, and breach of contract, Defendant abruptly withdrew from representation. He elected himself to provide immediate notice to opposing counsel and failed to take any steps to offboard or refer Plaintiff's representation. Days later, Defendant subsequently demanded a $2,500 payment without issuing an invoice and expressly admitted that he "had not done too much." Although Plaintiff not only agreed to payment without hesitation but also requested the invoice to include a billable rate and hours billed, Defendant failed to send the invoice to this date.

4. **Harm and Reliance:**

Plaintiff reasonably and detrimentally relied on Defendant's representation and assumed that Defendant had taken appropriate steps to protect his rights and ensure the fairness of the Transition Agreement. As a result of Defendant's deficient representation, Plaintiff executed a legally binding agreement that has now become the centerpiece of a pending arbitration matter with an asserted value between $15 and $45 million, depending on an award of punitive damages. Plaintiff has suffered significant reputational, economic, and strategic harm. On June 7, 2025, the D.C. Office of Disciplinary Counsel issued a formal Notice of Preliminary Inquiry regarding Defendant's conduct in this matter (Inquiry No. 2025-U891), confirming that the allegations meet the threshold for ethical review.

## CLAIMS FOR RELIEF

### Count I – Legal Malpractice (Negligence)

Defendant owed Plaintiff a duty to exercise the skill, prudence, and diligence of a reasonably competent attorney under the circumstances. Defendant breached that duty by failing to review or investigate the material risks associated with the proposed "Confidential Transition

COMPLAINT JURY TRIAL DEMANDED - 5

Agreement," failing to counsel Plaintiff on viable alternatives or timing strategies, and failing to protect Plaintiff's legal and reputational interests while facilitating the execution of a one-sided and coercive release.

Defendant further failed to perform even minimally adequate due diligence with respect to ongoing retaliation, reputational damage, or procedural fairness, despite being informed by Plaintiff of emerging facts that should have triggered affirmative action. As a direct and proximate result of Defendant's negligence, Plaintiff suffered measurable economic harm, reputational injury, and procedural disadvantage in a pending arbitration involving millions of dollars in damages.

### Count II – Breach of Fiduciary Duty

Defendant, as Plaintiff's legal representative, owed a fiduciary duty of undivided loyalty, candor, and competent advocacy. Defendant failed to disclose any conflicts of interest, limitations in his willingness to engage with opposing counsel, or misalignment with Plaintiff's goals and legal priorities. Defendant undertook the representation, contacted opposing counsel, and advised on key legal documents without clarifying the scope, risks, or limits of his representation.

Defendant subsequently withdrew from representation at a critical juncture—after receiving a filed arbitration demand and after Plaintiff's transition agreement had been executed—without cause, planning, or procedural transition. In doing so, Defendant acted in alignment with the interests of Plaintiff's former employer, rather than the client to whom he owed loyalty and transparency.

### Count III – Breach of Contract (Oral or Implied in Fact)

At all relevant times, Plaintiff and Defendant had an oral or implied-in-fact agreement that Defendant would serve as Plaintiff's attorney in connection with post-employment legal matters. Defendant undertook legal duties consistent with that agreement, including contacting opposing counsel and advising on settlement and separation terms. No written contract was ever provided, but Plaintiff reasonably relied on Defendant's affirmative representations and conduct as constituting an agreement to render legal services.

Defendant materially breached that agreement by failing to deliver the legal services promised, abandoning representation during a critical phase, and offering no adequate transition plan or successor referral. Plaintiff performed all obligations required under the agreement and relied on Defendant's representations to his detriment.

### Count IV – Fraudulent Misrepresentation and Constructive Fraud

Defendant made material omissions and misrepresentations to Plaintiff by remaining silent regarding potential conflicts of interest, limitations in his intended engagement scope, and risks associated with the transition agreement. Defendant had a duty to speak candidly once he undertook representation and assumed an advisory role.

By presenting himself as an advocate without disclosing misalignment or institutional bias, and by advising Plaintiff to sign an agreement without disclosing its procedural and substantive deficiencies, Defendant affirmatively misled Plaintiff at a moment of professional crisis. These acts constitute constructive fraud and/or actionable negligent misrepresentation under District of Columbia law.

### DAMAGES

As a direct and proximate result of Defendant's negligent representation, fiduciary breaches, and actionable misconduct, Plaintiff has suffered substantial and ongoing harm, including:

- **Economic damages** in an amount to be determined at trial, but presently estimated to exceed **$500,000**, arising from loss of legal leverage in a pending arbitration, deterioration of negotiating position, and reputational damage affecting current and future employment prospects;

- **Consequential damages** tied to the loss of a confidential in-house legal opportunity with AlphaSense, Inc.—an offer rescinded within days of the execution and internal disclosure of the transition agreement Defendant reviewed and failed to challenge;

- **Reputational and emotional harm** associated with being coerced into a procedurally deficient agreement without full and informed legal counsel, and then abandoned by counsel at a moment of acute professional exposure;

- **Punitive damages** warranted under applicable District of Columbia law, based on Defendant's reckless disregard for his duties of loyalty, candor, and professional care, and his facilitation of a known power imbalance under the guise of legal protection.

Plaintiff reserves the right to amend this Complaint to seek additional categories of damages, including attorneys' fees, litigation costs, and equitable relief, as may be warranted by discovery or further procedural developments.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendant as follows:

COMPLAINT JURY TRIAL DEMANDED - 8

1. An award of **compensatory damages** in an amount to be determined at trial, but not less than $500,000;

2. An award of **consequential damages**, including damages tied to lost professional opportunities and reputational harm;

3. An award of **punitive damages**, to the extent permitted by law, based on Defendant's reckless disregard for fiduciary duties and the public trust inherent in the practice of law;

4. A declaration that Defendant's representation was legally deficient, ethically inappropriate, and materially injurious to Plaintiff's legal rights;

5. An award of **costs and reasonable attorney's fees**, to the extent recoverable;

6. Such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff demands a jury trial by the maximum number of jurors permitted by law.

Dated: June 18, 2025

Respectfully submitted,

Cameron A. Brown, Esq.
1625 Eckington PL NE PH104
Washington D.C., 20002
Tel:     (909) 833-5169
Email: cabrwn@gmail.com

*Pro Se Plaintiff*

COMPLAINT JURY TRIAL DEMANDED - 9

EXHIBIT D

 **Gmail**                                              **Cameron A. Brown <cabrwn@gmail.com>**

---

## Update from AlphaSense

**7 messages**

---

**Erin Honigman** <ehonigman@alpha-sense.com>                    Fri, Apr 25 at 4:39 PM
To: <cabrwn@gmail.com>
Cc: <ehonigman@alpha-sense.com>, <hwang@alpha-sense.com>

Hi Cameron,

I hope this email finds you well. I wanted to reach out to provide an update for the Senior Counsel, Litigation & Commercial position here at AlphaSense.

The team wanted to extend their sincere appreciation for your time and effort through this process. Unfortunately we will not be able to continue with your candidacy at this time.

I have copied Herbert on this email who will be able to provide some additional context to the team's decision.

We wish you the best of luck!

Sincerely,

Erin & Team

---

**Cameron A. Brown** <cabrwn@gmail.com>                          Fri, Apr 25 at 5:00 PM
To: Erin Honigman <ehonigman@alpha-sense.com>
Cc: <ehonigman@alpha-sense.com>, <hwang@alpha-sense.com>

Hi Erin,

Thank you for the update. I respect the decision but would greatly appreciate any candid feedback on specific concerns that influenced the decision.

Best,

Cameron A. Brown, Esq.
Direct: +1.909.833.5169

[Quoted text hidden]

---

**Cameron A. Brown** <cabrwn@gmail.com>                          Fri, Apr 25 at 5:14 PM
To: Erin Honigman <ehonigman@alpha-sense.com>
Cc: <ehonigman@alpha-sense.com>, <hwang@alpha-sense.com>

Hi Herbert,

Thank you for connecting with me on this. Please find below two contacts at Paul Hastings. They will be able to either confirm my employment or direct you to whoever in Human Resources can do so. Please let me know if you need any additional information.

Adele Maloney - General Counsel

adelemaloney@paulhastings.com
12123186040

Kwame Manley - Global Head of Litigation
12025511962
kwamemanley@paulhastings.com

[Quoted text hidden]

---

**Herbert Wang** <hwang@alpha-sense.com>                                    Wed, Apr 30 at 6:30 PM
To: Cameron A. Brown <cabrwn@gmail.com>
Cc: Erin Honigman <ehonigman@alpha-sense.com>

Hi Cameron,

I reached out to the contacts you provided. Unfortunately, they only confirmed that you're still employed with the firm - not any specific standing. Unless you are able to convince them to speak with me more openly about this, we will have to move on to other candidates who have been waiting on us to give them a decision.

**Herbert Wang** (he/him)

VP, Legal

   

**Alpha**Sense

IMPORTANT: The contents of this email and any attachments are confidential. They are intended for the named recipient(s) only. If you have received this email by mistake, please notify the sender immediately and do not disclose the contents to anyone or make copies thereof.



[Quoted text hidden]

---

**Cameron A. Brown** <cabrwn@gmail.com>                                    Wed, Apr 30 at 7:03 PM
To: Herbert Wang <hwang@alpha-sense.com>

Dear Herbert,

Thank you for your transparency. If there's been any ambiguity, it likely stems from the Firm's general policy of non-engagement with external inquiries—they have no obligation to provide support in these contexts.

I understand that ambiguity can invite adverse inferences. In this case, none are warranted. I can state without hesitation that I remain actively employed by Paul Hastings, in good standing, with a resignation date already scheduled. I have not been disciplined or terminated.

Although I'm currently interviewing with two other tech companies, AlphaSense remains my top choice based on

the strength of the team, the mission, and the alignment with my background and long-term goals. I genuinely believe I can be an asset to your legal team long-term. If the door remains open, I'd welcome the opportunity to re-engage and can provide additional references if helpful.

Either way, I appreciate your candor and professionalism throughout.

Warm Regards,

[Quoted text hidden]

---

**Herbert Wang** <hwang@alpha-sense.com>                                   Thu, May 1 at 12:12 PM
To: Cameron A. Brown <cabrwn@gmail.com>

Thanks, Cameron. I've tried to push this a bit more with your contacts but they are beholden to their policies. At this stage, we unfortunately have to move on to other candidates.

I know this is not the result you were hoping for but if it is of any solace, the whole team really liked what they saw from you (which is why we are where we are in the first place). In an extremely competitive process with a large pool of high quality candidates, you definitely stood out. I do feel bad that we couldn't cross the finish line here but given your valuable experience and professional comportment, it goes without saying you will have absolutely no trouble finding another opportunity you will be excited about (and it sounds like that is already the case).

I wish you well
[Quoted text hidden]

---

**Cameron A. Brown** <cabrwn@gmail.com>                                   Thu, May 1 at 12:15 PM
To: Herbert Wang <hwang@alpha-sense.com>

Thank you so much, Herbert, for your efforts and kind words. I understand and wish you luck with your next candidate!

All the best,
[Quoted text hidden]

# EXHIBIT E

 Gmail

**Cameron A. Brown <cabrwn@gmail.com>**

## Confidential Inquiry Regarding Third-Party Employment Discussions

**Cameron A. Brown** <cabrwn@gmail.com>                                          Fri, Apr 25 at 6:03 PM
To: <adelemaloney@paulhastings.com>, frederick cooke <fcooke@rwdhc.com>, Kwame J Manley <kwamemanley@paulhastings.com>

Adele,

I am reaching out regarding a matter that raises serious confidentiality concerns.

I was recently informed by a prospective employer, AlphaSense, that they became aware of details concerning my employment status at Paul Hastings—specifically, the assertion that I am on "administrative leave." This information was provided to AlphaSense by a source at Paul Hastings. Also, this characterization was provided as the reason for their decision to rescind an offer. As you are aware, any information regarding my departure from the Firm is subject to strict confidentiality protections.

I have not, and will not, discuss these circumstances or the existence thereof with third parties, consistent with my obligations. I have directed AlphaSense to you and Kwame Manley for any necessary clarification. However, I want to emphasize the importance of ensuring that no one at Paul Hastings improperly discloses any information— whether accurate or inaccurate—about my employment status or the circumstances surrounding my departure.

Given the seriousness of this situation and its impact on my professional opportunities, I appreciate your prompt attention to confirm my employment with AlphaSense and dispel any inference of adverse implications.

Please provide a response at your earliest convenience.

Sincerely,


Cameron A. Brown, Esq.
Direct: +1.909.833.5169